# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 0:25-cv-62231-AHS

**HEALTH BUSINESS SOLUTIONS, LLC, a Florida limited liability company**
**Plaintiff/Counter-Defendant,**
**v.**

**INSIGHT CHICAGO, INC., a Foreign Profit Corporation,**
**Defendant/Counterclaimant.**

**Removed From: 17th Judicial Circuit in and for Broward County, Florida, Case No.: CACE-25-014728**

## DEFENDANT'S ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIM TO PLAINTIFF'S COMPLAINT

Defendant, Insight Chicago, Inc. ("Insight") hereby files its Answer, Affirmative Defenses, and Counterclaim to Plaintiff, Health Business Solutions, LLC's ("HBS") Complaint, and states:

## JURISDICTION, PARTIES, AND VENUE

1.      Insight admits that Plaintiff has attempted to bring an action for damages, but otherwise denies the allegations in Paragraph 1. Insight further denies that Plaintiff is entitled to any relief. On November 4, 2025, Insight removed this case to the United States District Court for the Southern District of Florida pursuant to 28 U.S.C. §§ 1332, 1441, and 1446.

2.      Insight is without knowledge of the allegations in Paragraph 2, and therefore, denies the allegations in Paragraph 2.

3.      Insight admits the allegations in Paragraph 3.

4.      The Master Agreement speaks for itself. On November 4, 2025, Insight removed this case to the United States District Court for the Southern District of Florida pursuant to 28 U.S.C. §§ 1332, 1441, and 1446. Insight acknowledges that United States District Court for the Southern District of Florida is *an* appropriate venue. Insight otherwise denies the allegations in Paragraph 4.

5.      Insight denies the allegations in Paragraph 5.

## COMMON ALLEGATIONS

6.      Insight admits that the parties executed the Master Agreement, dated December 1, 2021, attached as Exhibit 1 to the Complaint. Insight denies that Plaintiff is entitled to any alleged relief under the Master Agreement.

7.      The Master Agreement speaks for itself. Insight otherwise denies the allegations in Paragraph 7.

8.      The Master Agreement speaks for itself. Insight otherwise denies the allegations in Paragraph 8.

9.      Insight admits that HBS issued invoices between June 30, 2023 and August 31, 2025, but otherwise denies the allegations in Paragraph 9. Insight disputed and continues to dispute the invoices issued by HBS, and whether HBS provided the services stated therein.

10.      The Master Agreement speaks for itself. Insight otherwise denies the allegations in Paragraph 10, including that Insight failed to abide by the terms of the parties' agreement.

11.      Insight admits that on September 2, 2025, HBS sent a notice purporting to terminate the Master Agreement, but otherwise denies the allegations in Paragraph 11.

12.      Insight is without knowledge of the allegations in Paragraph 12, and therefore, denies the allegations in Paragraph 12.

## COUNT I – BREACH OF CONTRACT (PAYMENT OBLIGATION)

13.     Insight realleges and incorporates its answers to Paragraphs 1 through 12 of the Complaint as if fully set forth herein.

14.     The Master Agreement speaks for itself. Insight otherwise denies the allegations in Paragraph 14.

15.     Insight denies the allegations in Paragraph 15.

16.     Insight denies the allegations in Paragraph 16.

17.     The Master Agreement speaks for itself, otherwise denied. Insight denies that Plaintiff is entitled to any award of attorneys' fees and costs in this case.

With respect to the WHEREFORE clause (p. 3) to Count I of the Complaint, Insight denies that Plaintiff is entitled to any relief.

## COUNT II – ACCOUNTS STATED

18.      Insight realleges and incorporates its answers to Paragraphs 1 through 12 of the Complaint as if fully set forth herein.

19.     Insight admits it had a business relationship with HBS, but otherwise denies the allegations in Paragraph 19.

20.     Insight admits that HBS issued invoices between June 30, 2023 and August 31, 2025, but otherwise denies the allegations in Paragraph 20. Insight disputed and continues to dispute the invoices issued by HBS, and whether HBS provided the services stated therein.

21.     Insight denies the allegations in Paragraph 21.

22.     Insight admits that it has and continues to refuse to pay Plaintiff certain amounts that Plaintiff demanded be paid. Insight disputed and continues to dispute the invoices issued by

HBS, and whether HBS provided the services stated therein. Insight otherwise denies the allegations in Paragraph 22.

23.     Insight admits Plaintiff demanded payment, but Insight denies that the amounts were "agreed-upon," and Insight denies Plaintiff is owed the amounts alleged in the Complaint. Insight further denies all remaining allegations in Paragraph 23.

24.     The Master Agreement speaks for itself, and otherwise denied. Insight denies that Plaintiff is entitled to any award of attorneys' fees and costs in this case.

With respect to the WHEREFORE clause (p. 4) to Count I of the Complaint, Insight denies that Plaintiff is entitled to any relief.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense
### (First Breach)

Plaintiff's claims are barred by Plaintiff's prior material breach of the parties' agreement, and as more particularly set forth in Insight's Counterclaim.

### Second Affirmative Defense
### (Fraud)

Plaintiff's claims are barred by Plaintiff's fraud as more particularly set forth in Insight's Counterclaim.

### Third Affirmative Defense
### (Failure to State a Cause of Action)

Plaintiff fails to state a claim for account stated. Plaintiff failed to attach the alleged unpaid invoices upon which it bases its claim to its Complaint. *See AT&T Corp. v. Next Communications, Inc.*, Case No. 15-23699-Civ-COOKE/TORRES, 2016 WL 6962873, at *3 (S.D. Fla. Nov. 29, 2016) (quoting *In re Standard Jury Instructions—Contract and Business Cases*, 116 So. 3d 284,

331-32 (Fla. 2013) ("A copy of the account showing items, time of accrual of each, and amount of each must be attached to the Complaint…"). Instead, Plaintiff attaches a demand letter allegedly sent to Defendant that includes a "Statement" purporting to include a list of invoices and amounts allegedly due for certain invoices. However, the amounts listed for those certain invoice numbers referenced in the "Statement" are materially inconsistent with the actual original issued invoices, which Plaintiff failed to attach to its Complaint.

Additionally, Plaintiff has failed to state a cause of action for account stated because the account stated in the "Statement" attached to Plaintiff's complaint is incorrect on its face and repugnant to HBS's own invoices that were sent to Insight, but which Plaintiff fails to attach to the Complaint. As set forth more fully in Insight's Counterclaim, Plaintiff's "Statement" is materially inconsistent with *all* of HBS's own original invoices referenced in the "Statement" for the same billing period. The single purported "Statement" which is attached to Plaintiff's Complaint cannot, in and of itself, create liability for an account stated cause of action. *See Federal Deposit Ins. Corp. v. Brodie*, 602 So. 2d 1358, 1361 (Fla. 3rd DCA 1992) ("In an action for an account stated, failure to respond to a demand, without more, would not establish liability.") (quoting *Page Avjet Corp. v. Cosgrove Aircraft Service, Inc.*, 546 So.2d 16, 18 (Fla. 3d DCA 1989).

Further, Plaintiff only relies on "threadbare recitals of [the] cause of action's elements, supported by mere conclusory statements." *See Aerospace Precision, Inc. v. NexGen Aero, LLC*, CASE NO. 17-CV-61106-WPD, 2017 WL 10186583, at *6 (S.D. Fla. Sep. 27, 2017). "[F]or an account stated to exist, there must be an agreement that a certain balance is correct and due, and an express or implicit promise to pay that balance." *Id.* (quoting *S. Motor Co. of Dade Cty. v. Accountable Constr. Co.,* 707 So. 2d 909, 912 (Fla. 3d DCA 1998)). Plaintiff does not allege that Insight ever agreed that "the invoiced amounts were in fact due, or that it ever promised to pay

those sums." *Id.* (rejecting plaintiff's conclusory allegations, finding plaintiff failed to plead claim for account stated). Instead, Plaintiff offers only the perfunctory assertion that "Insight did not object to the invoices and/or statements within a reasonable time and thereby agreed, either expressly or impliedly, that the amounts stated therein were correct and due." Compl. ¶ 21. Indeed, Insight could not have agreed that the amounts listed in the "Statement" attached to the demand letter were due when those amounts were materially different from the amounts stated in the original invoices themselves. Moreover, Insight continuously disputed the amounts stated in the invoices received from Plaintiff, as well as the quality of services allegedly performed by Plaintiff.

**Fourth Affirmative Defense**
**(Fraud, Mistake, or Error)**

Plaintiff's claim for account stated in Count II is barred because there is fraud, mistake, and/or error in the amounts asserted, as more specifically set forth in Insight's Counterclaim. These errors and mistakes include, but are not limited to, (i) Plaintiff's "Statement" is materially inconsistent with *all* of HBS's own original invoices referenced in the "Statement" for the same billing period; (ii) Plaintiff has billed certain charges that are not authorized by or in conformity with the terms of the parties' underlying agreements; (iii) the "Statement" attached to Plaintiff's Complaint contains incorrect interest amounts which it has applied to the principal balance which Plaintiff claims is owing; (iv) the "Statement" contains purported charges which have already been paid by Insight; and (v) the "Statement" contains amounts allegedly owed for July and August 2025, but for which Plaintiff never issued an invoice to Insight for those services.

**Fifth Affirmative Defense**
**(Payment)**

Plaintiff's claims are barred because the amounts alleged to be due have been satisfied in part, or in whole, by payments made by Insight, as more specifically set forth in Defendant's Counterclaim.

**Sixth Affirmative Defense**
**(Accord and Satisfaction)**

Plaintiff's claims are barred by the doctrine of accord and satisfaction.

Under any alleged contract, Plaintiff reduced Insight's obligations under the agreement, including but not limited to the contingency fee, as set forth in Insight's Counterclaim. Plaintiff is barred from pursuing claims to recover amounts stated under the original agreement after having subsequently reduced Insight's monetary obligations, Insight having paid certain of the invoices, and Plaintiff retaining the payment for those invoices.

Additionally, Insight paid $6,794,896.93 toward the amounts HBS demanded on disputed invoices from June 2021 through May 2024, as part of a series of settlement agreements whereby the parties mutually intended to settle the disputed invoices. Insight tendered the payments to Plaintiff, and Plaintiff accepted those payments as full satisfaction and discharge of the disputed obligations. Plaintiff has not returned the payments it accepted. Plaintiff is barred from recovering amounts allegedly owed under the parties' original agreement after having accepted settlement payments in full satisfaction of the disputed invoices.

**Seventh Affirmative Defense**
**(Ratification)**

To the extent there was any modification of the parties' agreement, Plaintiff's claims are barred because Plaintiff ratified the subsequent amendments and modifications to the Master Agreement by its attempted performance in accordance with the terms stated in the subsequent

agreements. Further, Plaintiff ratified the parties' course of conduct concerning the ongoing billing-dispute notifications, and it ratified the resolution of the disputed invoices by accepting Insight's payment in full satisfaction of the disputed invoices.

### Eighth Affirmative Defense
### (Waiver)

Plaintiff's claims are barred by the doctrine of waiver. Insight paid $6,794,896.93 toward the amounts HBS demanded on disputed invoices from June 2021 through May 2024, as part of a series of settlement agreements. Plaintiff accepted those payments, and Plaintiff has not returned those payments. Plaintiff has waived its right to recover any additional amounts on disputed invoices that Insight previously paid to settle in full.

### Nineth Affirmative Defense
### (Duplicative)

Plaintiff's claim for account stated in Count II is barred because it is duplicative of Plaintiff's breach of contract claim in Count I. Plaintiff "may not ultimately recover on both theories." *City Beverage-Illinois, LLC v. Vital Pharmaceuticals, Inc.*, CASE NO. 20-CV-61353-MORENO/STRAUSS, 2022 WL 3137051, at *11 (S.D. Fla. Jul. 13, 2022).

### Tenth Affirmative Defense
### (Objected to Invoices)

Plaintiff's claim for account stated in Count II is barred because Insight objected to, or made a reasonable effort to object to, the amounts asserted in the subject invoices within a reasonable time, as more specifically set forth in Defendant's Counterclaim. Plaintiff's erroneous billing practices and adequacy of its services were the subject of continuous dispute during the parties' contractual relationship. Not only did Insight send written correspondence to Plaintiff concerning these disputes, but Insight also held weekly meetings with Plaintiff's representatives

during which it objected to the fees and other charges billed by Plaintiff. Additionally, in its correspondence to Plaintiff and during the weekly meetings, Insight also notified Plaintiff that Plaintiff continued to fail to satisfy its performance obligations, including its failure to meet customary industry standards.

**Eleventh Affirmative Defense**
**(No Mutual Agreement on Invoice)**

Plaintiff's claim for account stated in Count II is barred because there was never any mutual agreement between Insight and HBS regarding the amount Insight allegedly owes to Plaintiff. There was never any agreement between the parties as to the alleged account balance as stated in the Complaint.

**Twelfth Affirmative Defense**
**(Failure to Comply with Condition(s) Precedent)**

Plaintiff's claim for account stated in Count II is barred by failing to comply with condition(s) precedent. In addition to the material inconsistencies and deficiencies with Plaintiff's purported "Statement" attached to its Complaint as set forth above and in Insight's Counterclaim, Plaintiff also failed to issue to the Insight an invoice for services rendered in July or August 2025. Further, as set forth above, the "Statement" is materially inconsistent with *all* of HBS's own original invoices referenced in the "Statement" for the same billing period. In other words, Plaintiff did not issue invoices to Defendant for the amounts set forth in the "Statement."

**Thirteenth Affirmative Defense**
**(Failure to Mitigate Damages)**

To the extent Plaintiff failed to mitigate its damages, if any, and Plaintiff's damages, if any should be reduced accordingly.

### Fourteenth Affirmative Defense
### (Set Off)

Insight is entitled to a set off for payments it made to Plaintiff, but which Plaintiff has failed to apply to the Insight's account. The "Statement" attached to Plaintiff's Complaint does not apply the payments previously made by Insight, and instead, seeks payment for amounts previously paid by Insight.

### Fifteenth Affirmative Defense
### (Unjust Enrichment)

In the alternative, Insight maintains that Plaintiff has been unjustly enriched. Insight paid $6,794,896.93 toward the amounts HBS demanded on disputed invoices from June 2021 through May 2024, as part of a series of settlement agreements. Plaintiff accepted those payments, retained those payments, and Plaintiff has not returned those payments. At least half of the sums that Insight paid were not, in fact, justifiable, proper, due and owing, and HBS has been unjustly enriched in the amount of at least $3,397,448.47.

### Sixteenth Affirmative Defense
### (Novation)

In the alternative, Insight maintains that Plaintiff cannot prevail against Insight based upon the doctrine of novation, as there was a mutual agreement between the parties to substitute an existing valid obligation with a new obligation. The Master Agreement attached to Plaintiff's Complaint constitutes the existence of a previous contract. Further, the parties on one or more occasion entered into a new contract which resulted in the extinguishment of the original contractual obligation. The existence of a new contract and/or modification(s) to the previously valid contract extinguished Insight's duty(ies) and or obligations pursuant to the Master Agreement.

### Seventeenth Affirmative Defense
### (Estoppel)

In the alternative, Insight maintains Plaintiff's claims are barred by the doctrine of estoppel. Insight detrimentally relied upon the material representations made by Plaintiff to settle the allegedly outstanding invoices to avoid business disruption. Plaintiff's statements to settle the invoice disputes are contrary to Plaintiff's current asserted position. Plaintiff is estopped from asserting claims based upon disputed invoices that were part of the parties' prior settlement agreements.

### Eighteenth Affirmative Defense
### (Unconscionability)

The Master Agreement sued upon is unenforceable in whole or in part because it was an adhesion contract and/or unconscionable at the time it was allegedly made. Under the circumstances existing at the time of the alleged making of the contract, and in light of the commercial needs of Insight and the course of dealing of the parties, the fee schedule and terms of the agreement are contrary to market rates and standards, and are grossly one-sided in favor of Plaintiff, as more particularly set forth in Insight's Counterclaim. The Master Agreement, if enforced, will create an unconscionable result to the detriment of Insight.

### Nineteenth Affirmative Defense
### (Tender Back)

Plaintiff's claims are barred because Plaintiff has failed to tender back the payments it received from Insight to fully settle the disputed invoices, which Plaintiff now sues upon to recover in full. Accordingly, Plaintiff has not met the condition precedent to bring its claims.

## COUNTERCLAIM

Defendant/Counterclaimant, Insight Chicago, Inc. (**"Insight"**) hereby sues Plaintiff/Counter-Defendant, Health Business Solutions, LLC (**"HBS"**), and alleges as follows:

## I.     INTRODUCTION

1.     This case is about the efforts of a well-run non-profit healthcare provider (Insight) to revitalize a bankrupt hospital that provides critical services to a poor community, as well as the efforts of an abusive legacy medical collections company (HBS) to fraudulently extort payments from the new owner after HBS's poor service helped to bankrupt the old owner.

2.     In the 4.5-year history since Insight assumed control, Insight has constantly met, haggled, debated and discussed with HBS the shortcomings in both HBS's sub-standard services and its professional invoices. In these discussions, HBS had Insight 'over a barrel' because HBS is so entrenched in the antiquated billing system upon which the hospital relies that any disturbance to HBS's engagement causes debilitating interruptions. Yet the services did not improve, except at times when Insight did them itself. Each year in 2023, 2024, and 2025, Insight received a warning letter from federal regulators that the billing services for which HBS now demands payment were, in fact, materially deficient and non-compliant with federal law for extended periods. Meanwhile, throughout those years, HBS's unreliable approaches to its own records, accounts, invoices and reports manifested material internal conflicts (sometimes *$40,000,000.00* worth of conflicts) among its own data and statements. HBS couldn't seem to explain or keep its financial story straight, but the invoices kept coming and its demands were ardent. Especially in the interest of the residents that Insight serves, Insight tried to work fairly, reasonably and at length with HBS to correct the errors. But by September 2025, talks broke down.

3.      Through this case, HBS continues its pattern of making exorbitant demands upon threats of business disruption. Its Complaint relies upon a contract that expressly doesn't cover its claims and an 'account-stated' that materially departs from HBS's own invoices by millions of dollars, and for which even the underlying invoices were regularly and thoroughly disputed. Its position, in short, appears to be another fraud in a pattern of frauds. So far, those frauds have cost Insight anywhere between roughly $3,500,000.00 and $35,000,000.00, depending on which failures, breaches and frauds one is addressing. For the reasons that follow, Insight is entitled to various actual, consequential and punitive damages, as well as attorney fees and costs.

## II.    THE PARTIES AND THE COURT

4.      Insight incorporates by reference the allegations as to the parties, jurisdiction and venue that it set forth in its Notice of Removal (D.E. 1) and Supplemental Statement of Jurisdiction (D.E. 8).

5.      As an Illinois corporation with its headquarters and principal place of business in Chicago, Illinois, Insight is an Illinois resident.

6.      As a Florida LLC with all of its members (indeed, its sole member) being Florida residents, HBS is also a Florida resident. (D.E. 8 at 2.) Ray Berry (**"Berry"**) is HBS's sole owner and CEO and is authorized in every way to speak and otherwise act on its behalf.

7.      In the Complaint, Plaintiff/Counter-Defendant HBS independently and facially puts millions of dollars in controversy here. The Complaint was filed in state court and properly removed. In this Counterclaim, Insight also alleges millions of dollars in controversy.

8.      This Court has removal and diversity jurisdiction under 28 U.S.C. § 1332(a)(1), 1441(1) and 1446. (*See* Def.'s Notice of Removal, D.E. 1 at 1, 3-5.)

9.      On November 4, 2025, Insight removed this case from the Broward County courts to the United States District Court for the Southern District of Florida pursuant to 28 U.S.C. §§ 1332, 1441, and 1446. HBS's Complaint relies upon an arguably unconscionable and adhesive contract attached as Exhibit 1 to its Complaint—referred to here and elsewhere in the parties' pleadings as the "**Agreement**"—which identifies the courts in Broward County as the chosen forum. Insofar as the Agreement is valid, enforceable and applicable here, this is an appropriate venue by contract. Insofar as another express contract, implied contract, or no contract applies here, the main substance of the transactions and activity concerning this dispute occurred in Chicago, IL where Defendant Insight resides, and which is and/or would be the most appropriate venue.

### III.      FACTUAL BACKGROUND

#### A.  The June 2021 Rescue of a Bankrupt Chicago Hospital

10.      Insight currently controls and runs a hospital in South Chicago located at 2525 South Michigan Avenue, Chicago, IL 60616 (the **"Hospital"**), which is "a full-service community acute-care facility." Sam Kelly, *Mercy Hospital finalizes sale to keep doors open in Bronzeville*, Chicago Sun-Times (Apr. 3, 2021), *available at* https://chicago.suntimes.com/2021/4/3/22365497/mercy-hospital-sale-finalized-insight-chicago (last accessed Nov. 24, 2025). The Hospital is viewed as a critically important resource within its Chicago community. *See id.*

11.      Prior to June 2021, the hospital was known as Catholic Trinity Health System's Chicago Mercy Hospital. At the time, it was "a bankrupt hospital that serves some of Chicago's poorest residents." Ron Shinkman, *Trinity's Chicago Mercy Hospital enters deal to avert closing*

*doors* (March 5, 2021), *available at* https://www.healthcaredive.com/news/trinitys-chicago-mercy-hospital-enters-deal-to-avert-closing-doors/596194/ (last accessed Nov. 24, 2025).

12.     In or around June 1, 2021, Insight took control of the Hospital. This counterclaim refers to that change in control as the "**Transition**."

13.     Since the Transition, the Hospital has operated as the Insight Hospital and Medical Center. Under its new name and management, the Hospital has continued to serve some of Chicago's poorest residents, and at least 70% of its patients have relied upon coverage through Medicare or Medicaid.

14.     Before the Transition, HBS was one of the Hospital's vendors and contractors, responsible for the pursuit of denied insurance claims for the formerly bankrupt system.

15.     At the time of the Transition, upon information and belief, HBS was Trinity Health System's only ongoing billing contractor for the Hospital.

16.     Through the Transition, Insight retained the vast majority of the Hospital's doctors, staff and vendors, including HBS.

17.     Immediately after the Transition, HBS became Insight's only billing contractor for the Hospital.

18.     Some years before the Transition, HBS had implemented or used a billing software system, which it has continued to use throughout its work with Insight (the **"Old System"**).

19.     The Old System substantially lags behind current industry standards technologically in its lack of functionality and billing efficiency.

20.     The Old System is not compatible in terms of integration with other common, contemporary systems.

21.     By the time of the Transition, the Old System had already become substantially outdated and problematic.

22.     At all relevant times, HBS has continued to insist upon and/or require Insight to use the Old System.

23.     At all relevant times, efforts to replace the Old System have caused and/or would imminently cause substantial disruptions in Insight's medical-bill collections and cash flow. While cash flow is always important in a hospital system, Insight's overwhelming reliance upon thin-margin Medicare and Medicaid coverage mean that it cannot afford to lose one week of cash flow without substantially impacting its operations and community medical services. HBS is fully aware of this financial vulnerability.

24.     HBS has exercised unique control over the Hospital's billing and collections due to the Hospital's practical dependence upon HBS and its Old System, together with the outdated and incompatible nature of the Old System.

25.     Upon information and belief, in its dealings with Insight, HBS has regularly exploited its disruptive capacity and degree of control over the Hospital's billing capabilities to extract unreasonable, unfair and non-contractual rates of compensation—including those reflected on its invoices.

26.     Throughout the four-and-a-half-year period since the Transition, Insight has disputed HBS's invoices, services, quality of work and results.

27.     Billing disputes began almost immediately in 2021, as HBS invoiced substantial amounts for a staff that was not collecting enough receivables. While HBS's invoices for June and July 2021 ranged between $53,000 and $60,000, it quickly escalated those monthly rates to between $113,000 and $130,000 for August and September 2021, without commensurate results

in collections. Between October and December 2021, HBS billed roughly $129,000, $142,000 and $160,000, respectively, for incompetent and unimproved service.

28.     HBS's sloppiness in billing appeared early, when it issued a bill for September 2021 for exactly the same amount as August 2021, which it soon replaced with a revised bill for $2,312 more.

29.     It also included refunds early, citing commissions that had been paid but which apparently were not properly reflected on its prior issued bills.

30.     As a result of disputes and discussions relating to these early 2021 bills, Insight did not pay these bills until December 2021, amid discussions of the need for a formal contract to define the services and rates. Later, Insight ultimately paid bills for those months in 2021 to settle the matter in connection with the parties' entry into a new contract.

## B.  The Parties' December 2021 Agreement

31.     As a result of roughly six months of discussions about the need for HBS to improve its services in support of the Hospital, in December 2021 the parties entered the "**Agreement**" referenced in Plaintiff's Complaint and attached as Exhibit 1 to the Complaint.

32.     HBS or its counsel drafted the Agreement.

33.     The unamended, original Agreement is the only signed, written contract upon which HBS has relied when issuing its invoices and when seeking to enforce them here.

34.     The unamended, original Agreement is the only contract attached to HBS's Complaint, and the Complaint does not cite or acknowledge any amendment.

35.     The Agreement was effective December 1, 2021 and had a mandatory, maximum term ending November 30, 2024.

36.     By its express terms, the Agreement only covers "self-pay and self-pay after insurance accounts," (Pl.'s Ex. 1, Sched. 1A § 1.1), which are accounts for which the recipient of medical care—rather than insurance—is directly and chiefly responsible for payment.

37.     Nothing in that Agreement sets forth terms authorizing collections for insured claims.

38.     By its express terms, and consistent with any reasonable expectation in the heavily regulated area of medical billing, the Agreement specifies: "HBS shall implement and maintain necessary and sufficient policies and procedures in order to *comply with any and all federal, state and local laws, ordinances, rules and regulations* in connection with the performance of the Services and HBS's obligations under this Agreement, including but not limited to . . . regulations *or guidelines adopted or promulgated by the United States Department of Health and Human Services (or by its Centers for Medicare and Medicaid Services)* . . . ." (Pl.'s Ex. 1 § 4.2 [compliance] (emphasis added); *see also id.* § 4.3 [acknowledging application of federal healthcare regulatory laws].)

39.     By its express terms, the Agreement and its Schedule 1A only provide for four types of fees.

40.     As the first authorized fee under the Agreement, there is a "contingency fee of 7% on any payment received posted or transferred on any [relevant, self-pay] account." (Pl.'s Ex. 1, Sched. 1A § 3.)

41.     The market rate for collections of insured accounts is roughly 2-4%.

42.     As the second authorized fee under the Agreement, there is a "flat fee of $20.00 per account [withdrawn] due to discovered insurance or referral to a loan program." (Pl.'s Ex. 1, Sched. 1A § 3.)

43.     As the third authorized fee under the Agreement, for *other* customer service calls concerning accounts that are *not* assigned to HBS for any collection effort, there is a fee for providing a so-called 'extended business office' consisting of "a flat fee of $6,000 per FTE [full-time employee] per calendar month based on inbound call volumes." (Pl.'s Ex. 1, Sched. 1A § 3.)

44.     As the fourth and final authorized fee under the Agreement, Insight tolerated a one-time set-up fee of $2,500 for billing procedures. (Pl.'s Ex. 1, Sched. 1A § 4.)

45.     The Agreement states, "This Agreement or any of its provisions may be modified or amended at any time during its term, but only by an agreement in writing, signed by both parties . . . ." (Pl.'s Ex. 1, Agrmt. § 9.6.)

46.     The Agreement also entitles Insight to recover its attorney fees and costs from HBS, upon prevailing in litigation relating to the Agreement. (*See* Pl.'s Ex. 1, Agrmt. §§ 9.7, 9.11.)

### C. HBS's Quick Departure From Its December 2021 Agreement

47.     Consistent with its ongoing pattern of unreasonable and non-contractual billing, HBS immediately began to generate invoices demanding substantial sums for items *not* contemplated by the Agreement.

48.     Attached hereto Defendant's **Composite Exhibit A** is a set of invoices that HBS drafted and sent to Insight, spanning June 2021 through June 2025. In addition to HBS's regular invoices, it also includes some apparently errant or duplicative invoices.

49.     Due to the processes and systems that HBS imposed, including its Old System, HBS never provided Insight with straightforward, direct and accurate financial information in a format allowing Insight to reasonably account for and track the respective cash receivables and cross-verify the amounts HBS claimed on its invoices. While Insight could view HBS's manual entries of information in the Old System, HBS withheld information necessary to straightforwardly

verify and attribute the collections, deposits and charge-backs. Instead, HBS's "remits" never quite matched the receivables. To sort the matter out, Insight would have been required to divert substantial resources in order to sift through disorganized information and perform HBS's job for it, upon the pains of great inconvenience and costly business interruptions.

50.     Beginning in December 2021 and continuing through 2022, HBS's invoices reflect charges unjustified by the Agreement. For example, they charge for things seemingly outside the scope of the Plaintiff's Agreement, and the contingency rates charged do not match rates reflected in the Agreement.

51.     Upon information and belief, these early invoices apply contingency fees to insured (non-self-pay) claims, improperly impose staffing charges for accounts that HBS treated as assigned accounts, and misstate the amounts that HBS collected for Insight, that it paid to arrange genuine contractual staffing, or that it could lawfully claim to be due to HBS.

### D.  False Billing Continues Throughout the Invoices

52.     For each and every line-item on an HBS invoice, HBS is asserting that the charge for such line-item is supported and required to be paid by a then-existing contractual obligation, and further that the charge is justified by the facts concerning the services HBS actually provided and amounts it actually collected for Insight.

53.     By issuing an HBS invoice, HBS asserts that for each and every one of its line items concerning its collection activities, it has conducted those respective collection efforts in material compliance with federal and state medical-regulatory laws.

54.     Upon information and belief, none of HBS's invoices to Insight reflects an accurate, precise, appropriately substantiated, compliant and correct bill for actual services rendered.

55.     Instead, upon information and belief, each of the invoices attached within Composite Exhibit A was drafted and issued by HBS, was initiated to be sent to Insight at a respective certain time specially known to HBS based on information in its possession, and reflects at least one false statement concerning at least one specific material fact, including as to the purported amount properly and lawfully due and owing.

56.     In hindsight, some of HBS's billing patterns raise 'red flags' for fraud. For example, in October 2022 and then from December 2022 through March 2023, HBS's invoices reflect round dollar numbers (i.e., .00 cents) for the amounts purportedly collected from payors, which is unusual. On some of those invoices, moreover, the contingency rate that HBS's invoice quotes does not precisely yield the fee charged based on the amount that the invoice claims HBS collected.

57.     For September 2022, HBS received and retained two payments for the same invoice on the same staffing services.

58.     For December 2022, HBS issued two invoices at two different times demanding contingency fees for the same work on the same collections, and it ultimately collected the fees on *both* (i.e., double-billed) invoices for $150,846 and $177,515, respectively.

59.     In 2023, the Centers for Medicare and Medicaid Services ("**CMS**") sent the first of three letters finding a material default in the Hospital's federal billing and payment compliance for the early months of 2023. HBS was the Hospital's only contractor for such billing and payment in 2023. HBS saw the letter and proposed to intervene.(*See* **Def.'s Exh. B**: Ltr. Packet.)

60.     In January 2024, the federal CMS sent its second of three letters finding a material default in the Hospital's federal billing and payment compliance for the fourth quarter of 2023. HBS was the Hospital's only contractor for such billing and payment in 2023.

61.     In January 2025, the federal CMS sent its third of three letters finding a material default in the Hospital's federal billing and payment compliance for the fourth quarter of 2024. HBS was the Hospital's only contractor for such billing and payment in 2024.

62.     From June 2021 through September 2025, Insight continued to conduct good faith communications with HBS, in an effort to improve HBS's service and resolve the billing disputes.

63.     Throughout the period from June 2021 to August 2025, Berry and another HBS management-level agent engaged directly in Insight's regular (generally weekly) meetings to discuss the billing discrepancies, and in each such meeting either or both of them:

     a.   affirmed that the amounts invoiced were lawfully due under the contracts; and

     b.   affirmed HBS's compliance with the law and industry standards.

64.     Berry made other statements falsely affirming that the amounts invoiced were lawfully due, including his July 8, 2024 email to which he attached, among other things, an "invoice summary" and invoices dated between February 2022 and May 2023 falsely asserting that $1,231,299.08 was lawfully due and owing to HBS.

65.     Throughout the period from June 2021 to August 2025, upon pain and threat of substantial business disruption, Insight paid a total of or about $6,794,896.93 to settle—often with invoice-by-invoice exactitude—all of HBS's invoices through April 2024, as well as all but $18,455.61 of HBS's May 2024 invoice. These payments were intended to be and were in fact a full and final settlement of those disputed invoices.

66.     Upon information and belief, at least half of the sum that Insight paid (as stated in preceding paragraph) was not justifiable, proper, due and owing, thereby damaging Insight in the amount of at least $3,397,448.47.

67.     Insight agreed to settle each of those disputes as a result of the frauds and fraudulent practices set forth in Paragraphs 1 through 89 of this Counterclaim, as well as the ongoing insistence of HBS and Berry that such invoices were due upon pain of business disruption.

68.     Upon information and belief, HBS knew that each of the above representations was false when it and/or its agents made it. If it did not actually know, then it acted with reckless disregard for their truth, since it had all the information it needed in order to issue correct, legitimate invoices.

69.     Upon information and belief, HBS knew there was a high probability that Insight would suffer damage as a result of each of the above false representations, or HBS consciously disregarded Insight's rights in relation to HBS's conduct.

70.     Throughout the period from June 2021 to August 2025, HBS intended to induce the reliance of Insight and its agents upon each such billing-related and/or invoicing-related representation above, as HBS attempted to and did extract monetary payments from Insight based upon such representations—whether through the settlement payments or otherwise.

71.     Under all the circumstances described herein, Insight justifiably relied upon HBS's false statements, including but not limited to when Insight decided whether to simply settle the respective matters in order to avoid business disruptions.

**E.  Breakdown in Dispute Communications**

72.     Throughout the parties' discussions and into 2025, HBS's claims continued to diverge from its own records, casting substantial doubt on the truthfulness of its claims. As to 2025, the following columns in the chart below summarize voluminous records and information as to what HBS expressly claimed to Insight that it had billed on Insight's behalf, as compared with what the information in its STAR system reflected that it had billed. The columns show that

HBS's claimed billings are roughly double what its internal entries reflected, even as HBS continued to fail to provide information readily and independently verifying its actual billings and receivables:

| Month | Total Charges HBS Claimed to Have Been Billed | Charges HBS Generated, from STAR (Charge Generator) |
|---|---|---|
| January 2025 | $75,636,292.00 | $41,376,193.56 |
| February 2025 | $77,322,257.64 | $42,535,804.29 |
| March 2025 | $85,068,187.00 | $47,399,853.67 |
| April 2025 | $82,352,756.61 | $41,956,834.07 |
| May 2025 | $84,368,049.00 | $43,070,125.05 |
| June 2025 | $70,963,438.00 | $37,335,335.83 |
| July 2025 | $93,173,525.00 | $38,718,562.01 |

73.     Despite the discrepancies, and as part of a settlement-oriented payment plan, Insight began paying HBS $100,000 approximately weekly in order to settle older bills and avoid disruptions in HBS's practically (but not contractually) exclusive billing services.

74.     In connection with those settlement communications and as a result of their breakdown, HBS issued the invoice-statement (**"Statement"**) that it attached as a document Bates-numbered "PLAINTIFF000020" to its Complaint, and which is in the packet of materials removed to this Court from the Florida state court.

75.     HBS relies upon its Statement to support its $7,892,252.00 claim to this Court for an "Account Stated," as well as for a purported breach of contract.

76.     As further evidence of HBS's pattern of fraud, HBS's Statement does not track its own invoice data or Insight's prior payments.

77.     HBS's Statement includes $866,357.00 in purported charges concerning invoices through April 2024, which have already been settled and paid. The Statement falsely fails to acknowledge such payments, and HBS has not tendered back the amounts that Insight paid on such invoices before it elected to sue on them for different amounts.

78.     HBS's Statement is materially inconsistent with *all* of HBS's own respective invoices. The following Table summarizes HBS's voluminous documents:

| | Amt. HBS claims on the "Statement" | Amt. stated due on HBS's related invoice | Difference | % Difference |
|---|---|---|---|---|
| 2024-05-31 | $197,882.00 | *$18,455.61 | $179,426.39 | 90.67% |
| 2024-06-30 | $139,001.00 | $199,978.63 | -$60,977.63 | -43.87% |
| 2024-07-31 | $129,208.00 | $306,614.42 | -$177,406.42 | -137.30% |
| 2024-08-31 | $480,755.00 | $297,445.15 | $183,309.85 | 38.13% |
| 2024-09-30 | $510,406.00 | $255,427.37 | $254,978.63 | 49.96% |
| 2024-10-31 | $407,705.00 | $240,740.14 | $166,964.86 | 40.95% |
| 2024-11-30 | $349,346.00 | $214,442.93 | $134,903.07 | 38.62% |
| 2024-12-31 | $573,317.00 | $332,126.66 | $241,190.34 | 42.07% |
| 2025-01-31 | $531,054.00 | $268,815.99 | $262,238.01 | 49.38% |
| 2025-02-28 | $539,311.00 | $289,655.87 | $249,655.13 | 46.29% |
| 2025-03-31 | $515,928.00 | $309,213.61 | $206,714.39 | 40.07% |
| 2025-04-30 | $559,782.00 | $346,931.45 | $212,850.55 | 38.02% |
| 2025-05-31 | $552,273.00 | $345,906.04 | $206,366.96 | 37.37% |
| 2025-06-30 | $537,871.00 | $366,150.99 | $171,720.01 | 31.93% |
| 2025-07-31 | $514,433.00 | Not Issued | $514,433.00 | |
| 2025-08-31 | $487,623.00 | Not Issued | $487,623.00 | |
| | $7,025,895.00 | $3,791,904.86 | | |

79.     As to the Table above, as of the date of this Counterclaim, Insight is unaware of any actual HBS invoice for services rendered in July or August 2025, and in any event, the amounts claimed to be due are disputed.

80.     As to the Table above, for the months of May 2024 through August 2025, the Statement claims HBS is owed $3,233,990.14 *more* than HBS's own, original invoices demanded for the same period (minus amounts Insight already paid for May 2024, marked with an asterisk).

81.     As to the Table above, the red-shaded boxes reflect disputed invoices that post-date the Agreement's term for which there is no contract and which HBS has not substantiated.

82.     As to the Table above, the yellow-shaded boxes concern disputed invoices and fee rates.

83.     As to the Table above, the orange-shaded and red-shaded boxes concern invoices through June 2025, which contain new contingency rates for which there is no apparent written contractual basis.

84.     As to the Table above, the blue-shaded boxes reflect HBS's unexplained substantial downward departures from its original, still-disputed invoices. Upon information and belief, those unexplained downward departures reveal HBS's haphazard and manufactured approach to generating the numbers in the Statement.

85.     As to the Table above, although Insight asserts that there is no interest due on these disputed and/or settled invoices, the effective annual rate for a 1.5% monthly interest rate (i.e., the rate in the Agreement for relevant claims there) as compounded would ordinarily be roughly 19.56%. The percentage of the excess charges in the Statement as compared to the invoices, reflects annualized percentage rates of roughly 35%-50% (*see* Table above), which are contractually indefensible as purported interest charges.

86.     As to the Table above, each of the amounts that HBS claims due in the Statement sets forth a round ".00" (no-cents) figure, which—upon information and belief—is a false

statement. The appropriate fees or interest between the parties for actual medical collections do not regularly yield even-dollar figures.

87.     Upon information and belief, and in keeping with the seeming pattern of falsity in HBS's original invoices and its comments about them, HBS simply made up the numbers in its Statement to reach a financial result that it wanted. When combined with the $6,794,896.93 that Insight already paid, the totals in the Table *do* amount to roughly 7% of the total amount that HBS collected for Insight-although that amount came almost entirely from insurers, rather than from the Agreement's higher-rate, self-pay accounts.

88.     As a result of the breakdown in the parties' relationship, HBS has cut off Insight's access to billing documents, payment information and other material information.

89.     Any conditions precedent to commencement of this action have been satisfied, waived, or excused.

## IV.     COUNTERCLAIMS-COUNTS

### COUNTERCLAIM COUNT 1: BREACH OF CONTRACT (NON-COMPLIANCE WITH LEGAL STANDARDS)

90.     Defendant Insight incorporates each of the above allegations in Paragraphs 1 through 89, as if fully restated herein.

91.     In each and every invoice in Exhibit A, HBS claimed to be due certain monies under an existing contractual relationship between it and Insight.

92.     The unamended Agreement is the only express contract that HBS cites and upon which it relies in relation to the invoices.

93.     Under Section 4.2 of the Agreement, HBS had a material obligation to comply with the federal regulatory standards for medical billing that CMS established and/or enforces.

94.     Insofar as the unamended Agreement did not cover the invoiced services within its scope, and as a matter of alternative pleading, for each and every HBS invoice that was lawful, justified and compensable under a contract theory, HBS must have had an implied contract authorizing it to provide the relevant medical billing services competently, diligently, properly and effectively in exchange for the cited rates.

95.     In any written, oral or implied contract to provide medical billing services for a full-service hospital in the United States of America, it is an implicit, reasonable and necessary requirement that the medical billing contractor (a) competently know and meet the federal regulatory standards that CMS has established and/or enforces; and (b) act with as much promptness and accuracy with respect to billing private insurance or self-insurance/pay as is necessary to competently satisfy the federal regulatory standards enforced by CMS.

96.     Before, during and after the Transition, and in light of the relatively financially poorer population that the Hospital has traditionally served, HBS was aware and the parties intended that HBS's compliance with the CMS-related regulatory standards for medical billing was a material requirement for its contractual services.

97.     The industry guidelines for the medical billing industry require degrees of promptness and accuracy in private-payer billing that meet or exceed the requirements imposed for federal, CMS-regulated billing.

98.     The industry guidelines referenced in the immediately preceding paragraph apply to any contract—express or implied—to provide medical billing services for a full-service hospital in the United States of America, and they are among the "industry guidelines" expressly referenced in Section 4.2 of the Agreement.

99.     For the years 2021-2025, to render minimally, materially competent services concerning the Hospital, HBS knew or should have known that CMS required the Hospital to submit 85% of its bills within 30 days of the patient's discharge and in a manner passing front-end edits for consistency and completeness. The industry guideline and standard is to issue all such bills accurately within five (5) days of discharge.

100.    HBS's failures in competent performance caused CMS to cite a materially deficient 56.60% compliance rate in early 2023, a *worse* compliance rate of 44.2% in late 2023, and a materially deficient 68.3% compliance rate in late 2024.

101.    HBS's lateness and inaccuracy in federal CMS-related billings were characteristic of its inadequate and/or incompetent billing practices with respect to Insight's private-payor accounts that were not subject to federal payment.

102.    By engaging in consistently non-diligent, inconsistent and incomplete billing and collection efforts, upon information and belief HBS caused substantial reductions in the collectability of Insight's respective claims for public or private payment.

103.    By engaging in consistently non-diligent, inconsistent and incomplete billing and collection efforts, HBS breached any legitimate contract under which it invoiced Insight, including any of those alternative forms of the contracts referenced above.

104.    As a result of these breaches, upon information and belief, HBS caused Insight to incur returns or refunds of some claims that were previously paid by public or private insurers.

105.    By engaging in consistently non-diligent, inconsistent and incomplete billing and collection efforts during the period between June 2021 and August 2025, HBS failed to bill—either promptly or at all—hundreds of millions of dollars' worth of Insight's claims for patient-related payments.

106.    As a result of these breaches, HBS caused Insight to lose patient-related payment claims that HBS either never followed-up on or handled so poorly as to render them uncollectable.

107.    HBS's failure to comply with legal and industry standards in breach of its agreement(s) actually and proximately caused Insight to suffer damages of between $10,000,000.00 and $30,000,000.00 in the form of lost claims that would have been paid.

108.    HBS's failure to comply with legal and industry standards in breach of its agreement(s) actually and proximately required and caused Insight to hire a staff of more than ten (10) management-level people in a total amount averaging more than $1,000,000.00 per year for roughly the past two years, to oversee the functions and services that HBS is executing and providing and to correct HBS's errors. These failures result in damages averaging at least $1,000,000.00 per relevant contract/relationship year, which Insight otherwise would not need to expend if its billing service provider were competent, compliant and reasonably effective.

109.    Each and every invoice referenced above relates to and concerns the Agreement, regardless of whether it arises out of or falls within the correct scope of the Agreement. As a result, the Agreement entitles Insight to a contractual award of attorney fees and costs upon being a prevailing party in this litigation.

WHEREFORE Insight respectfully asks this Court to award it damages in an amount to be determined between $12,000,000.00 and $32,000,000.00, together with applicable interest, attorney fees, litigation costs as well as such other relief as this Court deems appropriate.

## COUNTERCLAIM COUNT 2: BREACH OF CONTRACT
## (BILLING AND INVOICING PRACTICES)

110.    Defendant Insight incorporates each of the above allegations in Paragraphs 1 through 89, as if fully restated herein.

111. If no contract between the parties justifies the amount(s) for which HBS invoiced Insight, then HBS's invoicing of the amount(s) violates and breaches its contractual obligation to bill or invoice only for amounts actually due and owing under such contracts. All sums paid via such breaches and without such express or implied justification must be returned.

112. Although the Agreement specified the claims, services and fees for which HBS could legitimately charge, HBS invoiced Insight for claims, services and fees that were not within the scope of the Agreement.

113. As set forth in the invoices attached as Exhibit A, HBS's invoices did not limit its demands and charges to amounts justified by the Agreement, but rather each and every invoice predominantly or entirely charges for items not contemplated within the Agreement.

114. Although terms of the Agreement such as its § 9.2 and Schedule 1A required HBS to promptly return any claim that was subject to ongoing dispute in exchange for a $20.00 fee, HBS did not promptly return such claims. Instead, HBS churned those claims in order to increase its fees, preoccupy or justify its staff time and/or cover up its materially deficient services.

115. Although § 4.3 of the Agreement required "HBS [to] keep and maintain complete and accurate . . . records concerning the performance of the Services and its obligations under this Agreement;" to provide Insight with "prompt access to the records at any time, upon request;" and "transfer such information and records" to Insight upon request:

   a. HBS refused to provide Insight with straightforward, direct and accurate financial information in a reasonably digestible format to account for and track the monies collected, received from and returned to payors;

   b. such refusals of reasonable information breached § 4.3 of the Agreement, as well as the same material provision of any alternative express or implied contract; and

c.  such refusals served in fact to obscure or conceal HBS's practice of billing for unjustified amounts.

116.  Throughout the relevant period, Insight actually notified HBS about its disputes and disagreements with HBS's invoices, practices and procedures through emails, during weekly meetings to address HBS's materially deficient performance, and via the nonpayment of invoices under discussion.

117.  As for disputes of invoices properly falling within the Agreement, Insight materially relied upon its conversations with HBS about such disputes, and HBS neither objected to receiving ongoing billing-dispute notifications by the means and practices above, nor indicated that it required such practical disputes to be 'papered' by additional formal written notices.

118.  Insofar as HBS relies upon any other contract to justify its invoices, such contract(s) include materially the same terms as the Agreement relating to claim-returns and financial- or record-tracking; and, moreover, the parties' ongoing dispute-notification practices described above define the terms under which Insight parties properly notified and submitted invoicing disputes to HBS for resolution.

119.  HBS materially failed to follow the contractual processes for resolving billing disputes, which failures resulted in HBS's maintaining and receiving payment for demands as to amounts that were not only unjustified in the first instance, but also unjustified under the contracts' dispute-resolution processes.

120.  If and insofar as HBS relies upon an implied contract to justify its respective invoices, for the reasons stated below in Counterclaim Count 3 incorporated herein by reference, at least half of the sums that Insight paid were not, in fact, justifiable, proper, due and owing, and HBS has been unjustly enriched in the amount of at least $3,397,448.47.

121.    Each and every invoice referenced above relates to and concerns the Agreement, regardless of whether it arises out of or falls within the correct scope of the Agreement. As a result, the Agreement entitles Insight to a contractual award of attorney fees and costs upon being a prevailing party in this litigation.

WHEREFORE Insight respectfully asks this Court to award it damages in an amount to be determined of at least $3,397,448.47, together with applicable interest, attorney fees, litigation costs as well as such other relief as this Court deems appropriate.

## **COUNTERCLAIM COUNT 3: COMMON LAW FRAUD** **(FALSE BILLING PRACTICES)**

122.    Defendant Insight incorporates each of the above allegations in Paragraphs 1 through 89, as if fully restated herein.

123.    As set forth above with greater particularity, HBS made a lengthy series of false statements of material fact, each of which is a separately fraudulent statement, including:

    a.  each invoice in Exhibit A, which contains a false statement concerning at least one material fact, including the amount properly and lawfully due and owing;

    b.  the false assertions of Berry and another certain HBS management agent during Insight's regular meetings to discuss the billing discrepancies;

    c.  Berry's July 8, 2024 email and its attachments, which include the materially false statements described above; and

    d.  HBS's "Statement" of purported accounts.

124.    HBS knew that each such representation was false when it and/or its agents made it, or it acted with reckless disregard for their truth in light of the information in its possession through which HBS should have known its statements were false.

125.    HBS knew there was a high probability that Insight would suffer damage as a result of each of the above false representations, or HBS consciously disregarded Insight's rights in relation to HBS's statements and conduct.

126.    HBS intended to induce the reliance of Insight and its agents upon each such representation, as HBS attempted to and did extract monetary payments from Insight based upon such representations.

127.    Under all the circumstances described above, Insight justifiably relied upon HBS's false statements.

128.    As a result of these false statements, Insight paid $6,794,896.93, and at least half of that sum was not justifiable, proper, due and owing, thus damaging Insight in the amount of at least $3,397,448.47.

129.    Due to the outrageous, fraudulent and deliberately oppressive nature of HBS's conduct, all the circumstances justify an award of punitive damages under this Count pursuant to Fla. Stat. Ann. § 768.72.

130.    Each and every invoice-related false statement that is referenced above in this fraud claim "relates to" the Agreement. As a result, the Agreement entitles Insight to a contractual award of attorney fees and costs upon being a prevailing party in this litigation.

WHEREFORE Insight respectfully asks this Court to award it consequential damages in an amount to be determined of at least $3,397,448.47, together with punitive damages, applicable interest, attorney fees, litigation costs as well as such other relief as this Court deems appropriate.

## COUNTERCLAIM COUNT 4: FRAUD IN THE INDUCEMENT (SETTLEMENT OF BILLING DISPUTES)

131.    Defendant Insight incorporates each of the above allegations in Paragraphs 1 through 89 as if fully restated herein.

132.    Insight paid $6,794,896.93 toward the amounts HBS demanded on disputed invoices from June 2021 through May 2024, as part of a series of settlement agreements.

133.    If there is no respective settlement agreement in an instance, then there is no fraud the inducement there, but there is also no good-faith basis for HBS to keep the payment.

134.    As set forth with more particularity above, HBS made a lengthy series of false statements of material fact in order to procure settlement agreements and their payments, each of which is a separately fraudulent statement, including:

   a.   each invoice in Exhibit A, which contains a false statement concerning at least one material fact, including the amount properly and lawfully due and owing;

   b.   the false assertions of Berry and another certain HBS management agent during Insight's regular meetings to discuss the billing discrepancies; and

   c.   Berry's July 8, 2024 email and its attachments, which include the materially false statements described above.

135.    HBS knew that each such representation was false when it and/or its agents made it, or it acted with reckless disregard for their truth in light of the information in its possession through which HBS should have known its statements were false.

136.    Insight agreed to settle each of those disputes as a result of the frauds and fraudulent practices set forth in the preceding paragraphs, as well as the ongoing insistence of HBS and Berry that such invoices were due upon pain of business disruption.

137.    When making each such fraudulent statement, HBS and Berry intended to induce Insight's settlement and payment of the respectively settled invoice.

138.    Under all the circumstances described above, Insight justifiably relied upon HBS and Berry's insistent, albeit false statements when deciding whether to simply settle the matters and avoid business disruptions.

139.    As a result of such settlement agreements, Insight paid $6,794,896.93 which was not in fact due and owing.

140.    Due to the outrageous, fraudulent and deliberately oppressive nature of HBS's conduct, all the circumstances justify an award of punitive damages under this Count pursuant to Fla. Stat. Ann. § 768.72.

141.    Each and every invoice-related false statement that is referenced above in this fraud claim "relates to" the Agreement. As a result, the Agreement entitles Insight to a contractual award of attorney fees and costs upon being a prevailing party in this litigation.

WHEREFORE Insight respectfully asks this Court to award it consequential damages in an amount to be determined of at least $6,794,896.93, together with punitive damages, applicable interest, attorney fees, litigation costs as well as such other relief as this Court deems appropriate.

## COUNTERCLAIM COUNT 5: FDUTPA, FLA. STAT. ANN. § 501.211(2) (FRAUDULENT BILLING PRACTICES)

142.    Defendant Insight incorporates each of the above allegations in Paragraphs 1 through 89 as if fully restated herein.

143.    HBS not only made a series of specific false statements in connection with HBS's invoices to Insight, but also engaged in a more general and actionable practice of false and fraudulent billing.

144.    Within the meaning of the FDUTPA, fraudulent billing constitutes an actionable, deceptive trade practice. Bills and invoices are deceptive when they are likely to mislead a reasonable recipient as to whether they include items that are not recoverable under the relevant

contracts or laws. *E.g.*, *James D. Hinson Elec. Contracting Co. v. BellSouth Telecomms., Inc.*, 796 F. Supp. 2d 1341, 1353 (M.D. Fla. 2011).

145.    Within the meaning of the FDUTPA, deception occurs where one or more of the offending party's relevant representations, omissions, or practices are likely to mislead the person acting reasonably in the circumstances, to that person's detriment. *See PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003).

146.    Within the meaning of the FDUTPA, "trade or commerce" includes billing practices. *See Turner Greenberg Assocs. v. Pathman*, 885 So. 2d 1004, 1008 (Fla. 4th DCA 2004); *State Farm Mut. Auto. Ins. v. Performance Orthopaedics & Neurosurgery*, LLC, 278 F. Supp. 3d 1307, 1327 (S.D. Fla. 2017).

147.    Under Fla. Stat. Ann. § 501.211(2), any person who has suffered losses as a result of a violation may commence a private action to recover actual damages, attorney's fees, and costs.

148.    In terms of market value, HBS charged at least twice the contingency rate that better medical billing firms charge for the same kind of services, HBS's sub-par services were worth less than half of what it charged as to the amounts actually collected, and HBS failed to collect tens of millions of dollars that a market-average medical bill collection firm would have collected.

149.    As set forth more fully in the allegations in the preceding counts above, Counterclaim-Defendant HBS's fraudulent billing practices caused Insight to suffer actual damages.

150.    Each and every invoice-related false statement that is referenced above in this fraud claim "relates to" the Agreement. As a result, and in addition to the statutory basis for attorney fees and costs above, the Agreement entitles Insight to a contractual award of attorney fees and costs upon being a prevailing party in this litigation.

WHEREFORE Insight respectfully asks this Court to award it its actual damages in an amount to be determined of at least $3,000,000.00, together with applicable interest, attorney fees, litigation costs as well as such other relief as this Court deems appropriate.

## COUNTERCLAIM COUNT 6: NEGLIGENT MISREPRESENTATION (FRAUDULENT BILLING PRACTICES)

151.    Defendant Insight incorporates each of the above allegations in Paragraphs 1 through 81, 116 through 125, and 129 through 134 as if fully restated herein.

152.    As set forth with factual particularity above, HBS, Ray Berry and his/its other agent made material misrepresentations within a materially misrepresentative series of representations while adopting materially misrepresentative practices. Each such misrepresentation was, in fact, false.

153.    As an alternative pleading to the prior Counterclaim Counts, this Counterclaim Count presumes and asserts in relation to each such statement, that if bad intent is not proven, then HBS, Berry and/or his/its other agent actually believed the statement was true, even though it wasn't.

154.    The maker of each such statement—whether HBS, Berry or its/his other agent— should have known that the statement was false because they possessed or had open access to the information the statement was about, they held themselves out as knowledgeable experts competent to make such statements, they undertook contractual duties to Insight to make sure their statements were true, they had access to all the regulatory resources necessary to know whether their statements were justified or false, they had access to all the industry and contractual resources necessary to know whether their statements were justified or false, and they had sufficient time and resources to determine whether they had spoken truly, accurately and with justification. As a result, they were negligent in making false statements and failing to promptly correct the same.

155.    As set forth more fully above, HBS and its agents intended to induce Insight to rely on each such misrepresentation.

156.    As set forth more fully above, Insight was injured through its reasonable, justified reliance upon each such misrepresentation.

157.    Each and every invoice-related false statement that is referenced above in this negligent misrepresentation claim "relates to" the Agreement. As a result, and in addition to the statutory basis for attorney fees and costs above, the Agreement entitles Insight to a contractual award of attorney fees and costs upon being a prevailing party in this litigation.

WHEREFORE Insight respectfully asks this Court to award it its actual damages in an amount to be determined of at least $3,000,000.00, together with applicable interest, attorney fees, litigation costs as well as such other relief as this Court deems appropriate.

## V.    PRAYER FOR RELIEF

WHEREFORE, Defendant/Counterclaimant, Insight Chicago, Inc. respectfully requests the Court to enter judgment in its favor and against Plaintiff, for actual damages, compensatory damages, and punitive damages, together with attorneys' fees and costs, pre- and post-judgment interest, all as respectively appropriate for the causes of action pled herein, as well as such other and further relief against HBS as this Court deems equitable, just and proper.

/s/Saura J. Sahu
Saura J. Sahu (*Pro Hac Vice*)

**GUNSTER, YOAKLEY & STEWART, P.A.**
450 East Las Olas Boulevard, Suite 1400
Fort Lauderdale, FL 33301
Telephone: 954-468-1383

George S. LeMieux, Esq.
Florida Bar No. 16403
glemieux@gunster.com
eservice@gunster.com

mzayas@gunster.com
Lauren A. Marcil
Florida Bar No.: 1002832
lshumate@gunster.com

**CLANCY ADVISORS, PLC**
Saura J. Sahu
2723 S. State Street, Suite 150
Ann Arbor MI 48104
Telephone: 734-780-7595
sahu@clancyadvisors.com
www.clancyadvisors.com

*Attorneys for Defendant, Insight Chicago, Inc.*

## CERTIFICATE OF SERVICE

I certify that on November 26, 2025, the foregoing was electronically filed with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

/s/ Lauren A. Marcil
Lauren A. Marcil, Esq.