## MASTER SERVICES AGREEMENT

**THIS MASTER SERVICES AGREEMENT** (this "**Agreement**") is entered into as of the 1st day of December 2021 (the "**Effective Date**"), by and between Health Business Solutions, LLC, with its principal place of address at 10620 Griffin Rd., Suite 204, Cooper City, Florida 33328 ("**HBS**"), and Insight Chicago, with its principal place of address at 2525 Michigan Avenue. Chicago, Illinois 60616 ("**Customer**" and, together with Service Provider, the "**Parties**").   Capitalized terms which are not otherwise defined herein shall have the meaning set forth in Schedule 2.

**Purpose:** Customer desires to engage HBS to provide certain services.  Customer understands and agrees that Service Agreements (as hereinafter defined) may be executed by HBS or its function-specific Affiliate having primary responsibility for performance of the requested services, which may include Eligibility and Advocacy Services, Insurance Resolution Services, Early Out Self-Pay Services, Third Party Liability Services (workers compensation and motor vehicle accidents), Bad Debt Collection Services, Aged  Zero Balance Workers Compensation Services, and Physician Insurance Resolution Services.

As used herein, the term "**Service Provider**" shall mean the entity that has executed the pertinent Service Agreement.

**Services:** "Services" means those services described in one or more Service Agreement(s) between Customer and Service Provider.  Services shall begin under a Service Agreement on the commencement date specified in the Service Agreement ("**Services Commencement Date**")

**Term:** This Agreement shall begin on the Effective Date and shall continue for a period of three (3) years  from the Effective Date (together with any renewals or extensions, the "**Term**").  The period of time during which Service Provider is to furnish Services under a Service Agreement shall be set forth in the Service Agreement and shall be referred to as the "**Service Agreement Term**".  If any Service Agreement Term extends beyond the end of the Term, the Term shall automatically be deemed to have been extended so that it is co-extensive with the Service Agreement Term.  Unless either Party gives notice of non-renewal at least six (6) months prior to the expiration of the then-current Term, the Term shall automatically renew in one (1) year increments for up to four (4) additional one (1) year periods.

**Fees:** Set forth in each Service Agreement.

| Customer Address(es) for Notice: | | Service Provider Addresses for Notice: | |
|---|---|---|---|
| Insight 2525 S. Michigan Ave. Chicago, Il. 60616 Attn:Ali Madha_____ Tel. No.:_____ | | Health Business Solutions, LLC. 10620 Griffin Rd. Suite 204 Cooper City, Fl. 33328 Attn: Ray Berry Tel. No.: 954-658-5591 | Service Provider at the address specified in the Service Agreement |

This Agreement comprises (i) the cover page above including the signatures on this page (the "**Cover Signature Pages**"); (ii) the following attached Schedules; and (iii) a Service Agreement referencing this Agreement entered into between Customer and Service Provider.  The attached Schedules are: (1) Schedule 1      "Master Terms and Conditions", (2) Schedule 2 "Defined Terms", (3) Schedule 3 "Business

1

Associate Agreement Terms".

      **IN WITNESS WHEREOF**, HBS and Customer have caused this Agreement to be executed and delivered by their respective duly authorized representatives as of the Effective Date.

| **Insight Chicago** | **Health Business Solutions, LLC.** |
|---|---|
| By: | By: |
| Print Name: __Ali Madha__ | Print Name: Ray Berry |
| Title: __Chief Operating Officer__ | Title: CEO |
| Date: __11/30/2021__ | Date: 12/31/21 |

2

## SCHEDULE 1

### Master Terms and Conditions

### 1.   ENGAGEMENT

1.1   Services. Customer, on behalf of itself and its Affiliates, hereby engages Service Provider to provide the services and functions described generally in this Agreement and explicitly identified in each Service Agreement entered into between Customer and Service Provider (the "**Services**"). Service Provider hereby accepts this engagement and shall provide the Services to Customer during the Term.

1.2   Service Agreements. The specific scope of Services, as agreed by the Parties during the Term, shall be set forth in statements of work (each, a "**Service Agreement**"). When executed by Customer and Service Provider, each Service Agreement shall automatically be deemed to become a part of this Agreement, and the terms and conditions of this Agreement shall apply to each Service Agreement.

1.3   Facility Operation. As between Customer and Service Provider, Customer shall be solely and exclusively in control of all aspects of the operation of Customer's Facilities. Service Provider shall have no responsibility for any aspect of the operation of the Facilities, other than the performance of the Services in accordance with the terms of this Agreement. Service Provider shall have no responsibility whatsoever with respect to the actual rendition of healthcare services at the Facilities.

1.4   Performance Standards. Service Provider shall perform the Services in a good and workmanlike manner consistent with Service Provider's applicable processes and protocols that operationalize the provision of the Services at the Facility(ies) specified in a Service Agreement (collectively, the "**Performance Standards**").

1.5   Engagement Managers. For each Service Agreement, Service Provider and Customer shall designate an engagement manager (each, an "**Engagement Manager**") and such person shall be identified in the Service Agreement. All communications regarding the Parties'

relationship under the Service Agreement should be addressed by such Engagement Manager or his or her designee, and such Engagement Manager or his or her designee shall have the authority to act for the appointing Party in connection with all aspects of the Service Agreement. Either Party may change its Engagement Manager by providing written notice to the other Party, and each Engagement Manager may establish a designee by written notice.

1.6   Reliance on Instructions. In performing its obligations under this Agreement and any Service Agreement, each Party will be entitled to rely upon any written instructions, authorizations, approvals or other information provided to the Party by the other Party's Engagement Manager and by any other personnel identified by the other Party as having authority to provide the same on behalf of the other Party in such person's area of competency. Unless a Party knew, or reasonably should have known, of any error, incorrectness or inaccuracy in such written instructions, authorizations, approvals or other information, a Party will incur no liability or responsibility in relying on or complying with any such written instructions, authorizations, approvals or other information.

1.7   Dependencies. Neither Party shall be liable for any delay or failure in the performance of its obligations under this Agreement or any Service Agreement hereunder, if and to the extent such delay or failure is caused by the actions or omissions of the other Party or the other Party's agents, or due to a breach of this Agreement or the Service Agreement by the other Party. Service Provider shall have no liability to Customer to the extent resulting from any failure of Customer to: (i) materially perform its responsibilities set forth in this Agreement; or (ii) provide accurate and complete data and instructions in accordance with the procedures set forth in the Service Agreement. Any delays in performance by Customer shall result in a corresponding extension in the time periods for performance by Service Provider of any of its

3

obligations that rely on the performance of Customer that was delayed and may result in additional fees.

1.8   Cooperation. At all times during the Term, Customer shall reasonably cooperate and work with Service Provider and, as necessary to: (i) facilitate the performance of the Services in an efficient and timely manner; and (ii) promptly resolve any failure of the Services (or the provision thereof) to comply with the terms of this Agreement or the applicable Service Agreement.

1.9   PHI.   To the extent that the Services involve access, use, creation or disclosure of PHI (as defined in the Business Associate Agreement Terms), the Parties agree to comply with the terms of the Business Associate Agreement attached as Schedule 3 ("**Business Associate Agreement**") which is hereby incorporated by reference.

1.10   Change Control. Either Party may propose changes in the scope of Services. Customer shall have no obligation to pay for any change, and Service Provider shall have no obligation to perform any change, unless the Parties both execute a change order, amendment, or addendum documenting the change.

2.   **FEES FOR SERVICES**

2.1   Fees.   Customer shall pay all fees, expenses, charges and obligations ("**Fees**") incurred from time to time in relation to the Services in accordance with the terms of the applicable Service Agreement, together with any other amounts payable to Service Provider under this Agreement.

2.2   Taxes. The prices and amounts specified to be payable by Customer hereunder do not include any sales, use, excise, value added, utility or other similar tax or charge which may be or hereafter become applicable to the Services provided hereunder.  Service Provider shall not be liable for any taxes, assessments or charges by any Governmental Authority that may be levied or assessed on any basis whatsoever in connection with Customer, excluding taxes, if any, assessed against Service Provider related to its income or assets.   Customer shall indemnify and hold harmless Service Provider from liability for all

interest and penalties relating to Customer's failure to provide proper tax information or to any Customer assessment contest, or for the amount of taxes owed.  Customer shall control any such contest and Service Provider shall provide reasonable information and reasonable assistance in connection with such contest at the expense of Customer.

2.3   Invoicing by Service Provider.   Unless otherwise agreed by the Parties in a Service Agreement, Service Provider shall bill Customer monthly during the Term for the Fees and other expenses associated with all Service Agreements and incurred during or applicable to the preceding calendar month.   All charges, billing and adjustments under this Agreement shall be stated in U.S. Dollars.  The invoice shall identify and itemize each component of the Fees and expenses and shall clearly indicate the specific Service Agreement or Service Agreements to which the Fee or expense applies.

2.4   Payment by Customer.   Customer shall make payments to Service Provider of all invoiced amounts within thirty (30) days after Customer's receipt of an invoice (the "**Payment Due Date**").

2.5   Billing Errors and Disputed Fees.   If Customer discovers what it in good faith believes is a billing error in an invoice from Service Provider (a "**Disputed Fee**"), Customer shall promptly notify Service Provider in writing of the amount of the Disputed Fee and the basis of the dispute, and shall pay the undisputed portion of the invoice by the Payment Due Date.   The Parties shall diligently pursue an expedited resolution of such dispute using the informal dispute resolution procedures set forth in Section 11.

3.   **SERVICE   PROVIDER PERSONNEL**

3.1   Service Provider Personnel.   Service Provider shall provide all Service Provider Personnel necessary to provide the Services, except as may be otherwise agreed in a Service Agreement.   None of the Service Provider Personnel shall be an Excluded Party and, in the event that Service Provider becomes aware of any Service Provider Personnel becoming an

4

Excluded Party, such Person shall be promptly relieved of any duties with respect to the performance of the Services.

3.2    Non-Solicitation.    During the Term (including any Transition Period) and for a period of one year after its termination or expiration, neither Party shall solicit or hire any current or former employee of the other Party involved in providing the Services for purposes of inducing such employee to become an employee of the other Party without first obtaining that Party's prior written consent; provided, however, that the foregoing shall not prohibit solicitations of employment resulting from mass media "want ads" or other search methodologies (e.g., use of a recruiting firm) not specifically directed towards either Party's employees.

4.    **DUTIES OF CUSTOMER**

4.1    Access to Customer Facilities.    Customer shall perform all Customer responsibilities set forth in this Agreement and each Service Agreement, and provide Service Provider with all necessary cooperation to allow Service Provider to provide the Services, including without limitation, providing Service Provider, without charge, (i) reasonable access to and adequate space in Customer's Facility(ies) when required for Service Provider personnel to provide Services on-site; (ii) record storage and retrieval suitable for the Services to be provided to each Customer Facility; and (iii) all reasonable and customary equipment necessary for Service Provider to provide the Services at each Customer Facility, including, but not limited to, furniture, fixtures, copy machines, fax machines, telephones, computer hardware, systems and networks, fax and telephone service.    In performing the Services, Service Provider shall comply with all of Customer's written policies applicable to any Customer Facility, including, but not limited to, any security policies of Customer, provided that Customer has provided copies of such policies to Service Provider in advance and Service Provider has approved such policies in writing (such approval not to be unreasonably withheld or delayed).

4.2    Appropriate Customer Data.    As between the Parties, Customer is responsible for the accuracy, quality, integrity and legality of any

and all Customer Data provided to or accessed by Service Provider in connection with the Services, and Service Provider may rely on all Customer Data furnished to it by Customer and Customer Personnel in connection with the Services, including any amendments to or changes in any of the Customer Data.    Service Provider and its Affiliates shall have a non-exclusive license to use such data as required to perform Services and otherwise as permitted under this Agreement.

5.    **CONFIDENTIAL INFORMATION**

5.1    Use of Confidential Information.    Each Receiving Party shall keep confidential all Confidential Information and not disclose or reveal such information to any third party (other than (i) Affiliates; (ii) Personnel of each Party and their Affiliates on a need to know basis in connection with performing or receiving Services hereunder; (iii) as necessary to perform obligations under this Agreement; and (iv) in connection with a Dispute related to this Agreement), without the express prior written consent of the Disclosing Party.    Each Receiving Party will take the same measures to protect the Confidential Information of the Disclosing Party in its possession or control that it takes to protect its own Confidential Information, but in no event less than reasonable measures.    In no event will Customer permit any disclosure of Service Provider Confidential Information to a direct or indirect competitor of Service Provider.

5.2    Disclosure Required by Law.    If a Receiving Party is requested or required by a Governmental Authority to disclose Confidential Information, or determines that a disclosure is affirmatively required by Law, the Receiving Party shall promptly notify the Disclosing Party of such request or determination so that the Disclosing Party may take, at its expense, such steps as are necessary to protect its Confidential Information, as applicable. If the Receiving Party is thereafter requested or required to disclose the Confidential Information to such Governmental Authority, only the part of such information as is requested or required by such Governmental Authority or for compliance with Law to be disclosed shall be disclosed.

5.3    Third Party Permissions. The provision of Services may require disclosure to Service

5

Provider of third party confidential or proprietary information in possession of Customer, such as applicable third party contracts and patient information, and in which Service Provider has no rights. Customer shall obtain consents for Service Provider to receive third party confidential or proprietary information (including patient information to the extent that consent is necessary to use such information to provide the Services) which may be required for Service Provider to provide the Services, including without limitation: consent to access, use and/or integrate with third party software licensed by Customer; consent to access Customer's applicable third party contracts; consent to use patient information to the extent that additional consent is necessary under applicable law to provide the Services; and any consents necessary to contact responsible parties via cellular phone (including for automatic dialing and texting purposes). Service Provider shall enter into confidentiality agreements with third parties on mutually acceptable terms, to the extent necessary to obtain such consents.

5.4   Return Upon End of Term. Following termination or expiration of this Agreement, neither Party shall: (i) use, recreate or reproduce, and shall cause its Affiliates to not thereafter use, recreate or reproduce, Confidential Information of the other Party; or (ii) disclose, or permit its Affiliates to disclose, such information to any third party. Each Party shall retain copies of Confidential Information of the other Party to the extent required under Section 6.1, and may use Confidential Information of the other Party to the extent necessary to verify or document the performance or receipt of Services, for audit purposes, and to enforce its rights and defend itself from any claims or causes of action related to this Agreement, the Services and/or the other Party.

6.   **RECORDS AND AUDITS**

6.1   Record Retention. Customer shall retain, and shall cause each Affiliate and/or Facility to retain, and Service Provider shall retain, all Records for the longest of: (i) through the end of the sixth (6th) full calendar year after the last fiscal year of Customer during which any Services are being provided to Customer by

Service Provider; (ii) such period of time as agreed in the applicable Service Agreement for specifically identified Records, or such longer period as required by applicable Law; (iii) such longer period as is required by a Party's records retention policy; or (iv) for the period of any Claim, Dispute or inquiry of any Governmental Authorities, for Records relevant to such Claim, Dispute or inquiry.

6.2   Record Request. Upon reasonable request and notice from a Party, the other Party shall recover such Records and deliver them to the requesting Party within a reasonable period of time, with the requesting Party paying the other Party's reasonable and documented expenses in connection with fulfilling such request. Notwithstanding the foregoing, neither Party is required to provide Records in violation of privacy rights of third parties or to waive applicable attorney-client, auditor-client or other legal privilege.

6.3   Regulatory Audit. In the case of an audit of Customer or any Facility performed by or on behalf of any Governmental Authority having jurisdiction over Customer or such Facility, or as part of its Payment Card Industry Data Security Standards obligations (collectively "**Regulatory Audit**"), Service Provider will provide reasonable access to relevant Records in its possession or control; provided that Service Provider will be entitled, at its sole cost and expense, to challenge any such request for or seek a protective order with respect to any materials or access requested. The cost and expense of any Regulatory Audit, other than the costs and expense associated with any challenge or protective order made by Service Provider, shall be borne solely by Customer.

6.4   During the Term, but no more than once annually, Customer may cause, at its sole cost by an auditor reasonably acceptable to both Customer and Service Provider, an audit of the fees paid under this Agreement ("**Audit**"). The results of any Audit shall be provided to Service Provider in writing. Any Audit will be conducted during regular business hours at Service Provider's facilities and in such a manner as to not interfere with the operations of Service Provider and its Affiliates and customers.

6

Customer shall give Service Provider sixty (60) days prior written notice of its intent to perform an Audit. No Audit may, however, be scheduled at the same time as Service Provider already has an internal or external audit (including another audit by Customer) being conducted. A formal entrance letter will be submitted to Service Provider at the time the Audit is requested which shall include, at a minimum, the scope of the requested Audit. When the Audit is finalized and a written copy of the results provided to Service Provider, an exit conference will be held and Service Provider will be given the opportunity to attend and respond to any findings in the Audit.

### 7.    INDEMNIFICATION

7.1    Customer Indemnification. Customer shall indemnify and hold harmless Service Provider, its Affiliates and each of their respective directors, officers, employees and agents (collectively, the "**Customer Indemnified Parties**") from and against any loss, damage or liabilities (including reasonable attorneys' fees, costs and expenses incurred in connection with any indemnified claim, action, lawsuit, proceeding or investigations) ("**Losses**") which result from or arise out of any claim, action, lawsuit, proceeding or investigation asserted or made by or on behalf of third parties or which result from or arise out of any governmental action or which are otherwise asserted against or sought from any Customer Indemnified Party in connection with this Agreement or the Services provided pursuant to this Agreement only to the extent such Losses are caused by (i) the fraud, willful misconduct or gross negligence of a Service Provider Indemnified Party; (ii) any failure by Service Provider Indemnified Party to comply with the Law; or (iii) the failure of Customer to obtain any third party consents which may be required; except to the extent such Losses are caused by the fraud, willful misconduct or gross negligence of, or the breach of this Agreement by, a Customer Indemnified Party.

7.2    Service Provider Indemnification. Service Provider shall indemnify and hold harmless Customer, its Affiliates and each of their respective directors, officers, employees and agents (collectively, the "**Service Provider Indemnified Parties**") from and against any Losses which result from or arise out of any claim, action, lawsuit, proceeding or investigation asserted or made by or on behalf of third parties or which result from or arise out of any governmental action (excluding any action of Customer) or which are otherwise asserted against or sought from any Service Provider Indemnified Parties in connection with this Agreement or the Services provided pursuant to this Agreement only to the extent such Losses are caused by (i) the fraud, theft, willful misconduct or gross negligence of a Customer Indemnified Party, or (ii) any failure by Customer Indemnified Party to comply with the Law; except to the extent such Losses are caused by the fraud, willful misconduct or gross negligence of, or the breach of this Agreement by, a Service Provider Indemnified Party.

7.3    Indemnification Process. Promptly after becoming aware of a Claim, the Indemnified Party shall notify the Indemnifying Party of the Claim and the basis of the Indemnified Party's request for indemnification and shall provide the Indemnifying Party with a copy of all pleadings, papers, notices, documents and correspondence received or delivered by the Indemnified Party in connection with the Claim. The Indemnifying Party shall control such defense and negotiations, shall notify the Indemnified Party that it is doing so, and shall retain the right to make final decisions with respect to the defense or settlement thereof. The Indemnified Party shall have the right to participate in the defense or settlement of the Claim at its own expense.

7.4    Sole Recourse. This Section 7 shall constitute the sole recourse of the Parties hereto with respect to any Loss arising out of a Claim.

### 8.    REPRESENTATIONS

8.1    Service Provider and Customer each represents that, as of the Effective Date and throughout the Term: (i) It is duly organized and in good standing in every jurisdiction where it is required so to be; (ii) It has the power and authority to sign, and to perform its obligations under, this Agreement; (iii) This Agreement is duly authorized and signed and is its legal, valid and binding obligation, subject to bankruptcy, insolvency, reorganization, moratorium and other

Laws of general application affecting the rights and remedies of creditors and secured parties generally; (iv) Any consent, authorization or instruction required in connection with its execution and performance of this Agreement has been provided by any relevant third party; and (v) It is not an Excluded Party. Customer represents as of the Effective Date and throughout the Term that: (i) Customer is legally authorized to operate the Facilities, provide healthcare services, and to engage Service Provider to provide and make available the Services under this Agreement; (ii) All Customer Data provided to Service Provider is true and correct and may be relied upon by Service Provider; and (iii) Customer shall materially comply with all Customer Laws. Service Provider represents as of the Effective Date and throughout the Term that Service Provider shall materially comply with all Service Provider Laws.

8.2 _Disclaimer_. EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT, SERVICE PROVIDER HEREBY DISCLAIMS ALL REPRESENTATIONS AND WARRANTIES, EXPRESS OR IMPLIED, MADE TO CUSTOMER OR ANY OTHER PERSON, INCLUDING ANY WARRANTIES REGARDING QUALITY, SUITABILITY, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR OTHERWISE (IRRESPECTIVE OF ANY COURSE OF DEALING, CUSTOM OR USAGE OF TRADE), OF ANY SERVICES OR ANY GOODS PROVIDED UNDER THIS AGREEMENT OR INCIDENTAL TO ANY SERVICES PROVIDED UNDER THIS AGREEMENT. SERVICE PROVIDER HEREBY DISCLAIMS ANY WARRANTY OF TITLE OR NON-INFRINGEMENT EXCEPT AS OTHERWISE SET FORTH IN THIS AGREEMENT.

9. LIMITATION OF LIABILITY

9.1 IN NO EVENT SHALL SERVICE PROVIDER, ITS AFFILIATES OR THEIR PERSONNEL BE LIABLE FOR ANY INDIRECT, CONSEQUENTIAL, SPECIAL, INCIDENTAL, PUNITIVE, OR OTHER EXEMPLARY LOSSES OR DAMAGES, INCLUDING LOST OR PROSPECTIVE PROFITS, WHETHER BASED IN CONTRACT, WARRANTY, INDEMNITY, NEGLIGENCE, STRICT LIABILITY OR OTHER TORT OR OTHERWISE, REGARDLESS OF THE FORESEEABILITY OR THE CAUSE THEREOF.

9.2 NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, THE CUMULATIVE LIABILITY OF SERVICE PROVIDER AND ITS AFFILIATES AND THEIR PERSONNEL TO CUSTOMER FOR ALL CLAIMS AND LOSSES FOR ANY CAUSE WHATSOEVER, INCLUDING THOSE ARISING OUT OF OR RELATED TO THIS AGREEMENT, THE APPLICABLE SERVICE AGREEMENT AND/OR THE SERVICES, AND REGARDLESS OF THE FORM OF ACTION OR LEGAL THEORY, SHALL NOT EXCEED THE TOTAL DOLLAR VALUE OF THE FEES RECEIVED BY SERVICE PROVIDER FROM CUSTOMER UNDER THE APPLICABLE SERVICE AGREEMENT DURING THE 12 MONTHS IMMEDIATELY PRECEDING THE DATE THAT THE EVENT, ACT OR OMISSION FROM WHICH SUCH LIABILITY AROSE. WITHOUT LIMITING THE FOREGOING, NO CLAIM SHALL BE PERMITTED TO BE BROUGHT MORE THAN 2 YEARS FROM THE EVENT, ACT OR OMISSION FROM WHICH SUCH CLAIM AROSE.

9.3 The damage exclusions and limitations specified in Section 9.2 shall not apply to Service Provider's right to Fees and other amounts that are due for Services under this Agreement. The monetary liability of Customer and Service Provider under this Agreement to one another in connection with any Claim under this Agreement shall be no greater than Customer's and Service Provider's proportional responsibility for the liability occasioned by Customer's and Service Provider's acts or omissions giving rise to the liability. Notwithstanding anything to the contrary in this Agreement, Service Provider shall be excused from any breach of the terms this Agreement and/or any Service Agreement, including any failure to meet an applicable Performance Standard, Service Level and/or Implementation Milestone, to the extent such breach and/or failure is caused by: (i) Customer's

8

failure to comply with any of its own obligations under this Agreement or an applicable Service Agreement; (ii) performance is prevented, reduced, or delayed as a result of action or inaction of Service Provider undertaken at the instruction of Customer, or employees, agents, contractors, or subcontractors; (iii) performance is prevented, reduced, or delayed as a result of any action or inaction of regulatory agencies; (iv) a Force Majeure Event; (v) any applicable Law prohibiting or limiting the performance or receipt of the Services; (vi) a failure by Customer to provide Service Provider, within a reasonable time after receipt of Service Provider's request, with any Customer Data that is necessary for Service Provider to perform the Services; (vii) any inaccurate Customer Data supplied to Service Provider in connection with the performance of Services; or (viii) any failure by Customer to obtain or maintain all necessary consents required by this Agreement or a Service Agreement.

9.4   Essential Basis of the Bargain.   The disclaimers, exclusions and limitations of liability set forth in this Agreement form an essential basis of the bargain between the Parties, and, absent any of such disclaimers, exclusions or limitations of liability, the provisions of this Agreement, including, without limitation, the economic terms, would be substantially different.

**10.       TERMINATION**

10.1  Termination by Customer for Cause. Customer shall have the right to terminate, in its discretion, either this Agreement or any one or more Service Agreements upon notice to Service Provider in the event of the occurrence of any of the following, subject in each case to Section 10.6: (i) a material breach of this Agreement or any Service Agreement by Service Provider; or (ii) Service Provider's material violation of Service Provider Laws.  Notwithstanding the foregoing provisions of this Section 10.1, if any of the occurrences described in subsections (i) – (ii) are cured within 60 days after Customer's written notice to Service Provider of its intention to terminate,  then Customer shall not have the right to terminate for such cured breach.

10.2  Termination by Service Provider for Cause.  Service Provider shall have the right to terminate, in its discretion, either this Agreement or any one or more Service Agreements upon notice to Customer in the event of the occurrence of any of the following: (i) a material breach of this Agreement or any Service Agreement by Customer; or (ii) Customer's material violation of Customer Laws.  Notwithstanding the foregoing provisions of this Section 10.2, if any of the occurrences described in subsection (i) – (ii) are cured within 60 days after Service Provider's written notice to Customer of its intention to terminate, then Service Provider shall not have the right to terminate for such cured breach. Notwithstanding the foregoing provisions of this Section 10.2, upon 10 days' notice to Customer, Service Provider shall have the right to suspend the provision of Services under this Agreement without terminating this Agreement in the event Customer fails to pay any of the Fees payable by the applicable Payment Due Date.

10.3  Termination   for   Loss   of   License; Conviction of Crime.  Notwithstanding anything to the contrary in this Agreement, either Party shall have the right to immediately terminate this Agreement upon written notice to the other Party: (i) if the first Party loses any licenses or permits necessary and material to the operation of its business or the performance of its obligations under this Agreement; (ii) if the first Party becomes an Excluded Party; (iii) if any officer, director and/or key employee of the first Party is convicted of a felony or any other crime relating to health care services; or (iv) as otherwise set forth in this Agreement.

10.4  Termination for Insolvency.  Each Party shall have the right, in its discretion and upon 30 days' written notice to the other Party, to terminate this Agreement or any one or more Service Agreements: (i) if the other Party ceases to carry on its business or becomes insolvent; (ii) upon  the  institution  or  apparent  imminent institution   of   bankruptcy,   receivership, insolvency, reorganization or other similar proceedings by or against the other Party under any section or chapter of the U.S. Bankruptcy Code, as amended ("**Bankruptcy Code**"), or under  any  other  applicable  Laws,  if  such proceedings  have  not  been  dismissed  or discharged  within  30  days  after  they  are instituted; (iii) the assignment for the benefit of creditors or the admittance by the other Party of

9

any involuntary debts as they mature or the institution of any reorganization arrangement or other readjustment of debt plan of the Party not involving the Bankruptcy Code or any other applicable Laws; (iv) the appointment of a receiver for all or substantially all of the other Party's assets; (v) any corporate action taken by the Board of Directors (or an analogous governing body) of the other Party in furtherance of any of the above actions; or (vi) a material adverse change in the other Party's financial condition, including, without limitation, the other Party's having negative net worth, being unable to meet its financial obligations as those obligations become due, or not having adequate cash flow to sustain operations or meet working capital needs.

10.5   Obligations Upon Termination. Except as may be provided under an applicable Service Agreement, upon any termination of this Agreement or a Service Agreement, Service Provider's obligations to perform Services hereunder or with respect to such Service Agreement shall completely cease; except that Service Provider will reasonably cooperate with Customer to assist in the orderly transfer of the services in connection with the expiration or earlier termination of the Agreement or a Service Agreement (the "**Transition Services**"). The Parties shall develop a plan for the Transition Services which will establish the amounts to be paid by Customer and the specific tasks to be undertaken by Service Provider. In the event this Agreement is terminated by Service Provider due to an uncured payment default by Customer, Customer must prepay the estimated amount of the charge for the Transition Services on a quarterly basis and cure the payment breach before Service Provider is obligated to provide, or continue to provide, the Transition Services. At the end of each quarter, Customer must also pay any sums due in excess of the estimated amount. The period of time that Service Provider shall provide Customer with the Transition Services after the end of a particular Service Agreement Term or after the end of the Term shall be the "**Transition Period**", which shall not extend beyond six (6) months from the end of the Service Agreement Term or Term, as applicable. The Transition Services shall be deemed a part of

the Services, and Fees associated therewith shall be as calculated in accordance with each applicable Service Agreement.

10.6   Payment of Fees in the Event of Termination or Expiration.   Upon any termination or expiration of this Agreement, or any one or more Service Agreements during the Term, Customer shall pay to Service Provider all Fees that have accrued for performed Services (including for work in progress and Transition Services) under the terminating or expiring Service Agreements.

## 11.      DISPUTE RESOLUTION

11.1   Escalation.   The Engagement Managers shall attempt to resolve any disputes that arise between the Parties (each a "**Dispute**"). If they are unable to resolve a dispute following reasonable efforts, either Party may submit a written notice of Dispute to the other, and the Dispute shall then be escalated to an officer of Customer and an officer of Service Provider (or the appropriate Service Provider Affiliate) for review and resolution. Within five (5) business days after the date the notice of Dispute is sent, the Parties' officers shall meet in person or telephonically and shall use commercially reasonable, good faith efforts to attempt to promptly resolve the Dispute without further escalation. If the Dispute is not resolved by the Parties' officers within thirty (30) business days after the date the notice of Dispute is sent (or such longer period of time as may be mutually agreed to in writing by the Parties), either Party shall have the right to initiate binding arbitration pursuant to the procedures set forth in this Section 11.   The Parties agree to continue performing their respective obligations under the Agreement while the Dispute is being resolved unless and until such obligations are terminated in accordance with the provisions of this Agreement.

11.2   Unresolved Dispute.   If the informal Dispute resolution procedures set forth in Section 11.1 do not lead to a mutually acceptable resolution of the Dispute within sixty (60) days (or any longer period of time mutually agreed to by the Parties), either Party may initiate arbitration pursuant to Section 11.3 with regard to the Dispute.

10

11.3 <u>Arbitration</u>. All Disputes that cannot be resolved pursuant to the procedure set forth in <u>Section 11.1</u> shall, except as provided herein, be solely and finally settled by binding arbitration conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association (the "**AAA Rules**"). If a Party determines to submit a Dispute for arbitration, such Party shall furnish the other Party with a dated, written statement (the "**Arbitration Notice**") indicating (i) the nature, with reasonable detail, of the Dispute and (ii) the remedy or remedies such Party will seek.

11.3.1 In the event the aggregate amount in controversy for a Dispute is $300,000.00 or less, the Dispute shall be solely and finally settled by a single arbitrator in accordance with the Expedited Procedures contained in the AAA Rules, and the requirements of Section 11.3.3.

11.3.2 All other Disputes shall be solely and finally settled by a board of arbitrators consisting of three (3) arbitrators, in accordance with the AAA Rules, and the requirements of this <u>Section 11.3.2</u> and <u>Section 11.3.3</u>. Within twenty (20) days after the date of the Arbitration Notice, each Party shall select one arbitrator. The two arbitrators shall select a third arbitrator. The third arbitrator shall be a Person who has over five (5) years professional experience in services similar to the Services provided hereunder and who has not previously been employed by either Party and does not have an interest in either Party or the subject matter of the arbitration. While the third arbitrator shall be neutral, the two Party-appointed arbitrators are not required to be neutral. The arbitration proceedings shall be held in Nashville, Tennessee. The Parties will provide each other with production of all requested documents and records reasonably related to the dispute in a manner that will minimize the expense and inconvenience of both Parties. Discovery will not include depositions or interrogatories except as the arbitrators expressly allow on a showing of need. Hearings must commence no later than ninety (90) days following the date of the Arbitration Notice. The arbitrators shall issue a final decision no later than one hundred twenty (120) days following the date of the Arbitration Notice that, in their judgment,

is consistent with the terms of this Agreement, the intent of the Parties, and Law, as supported by evidence presented by the Parties in the arbitration proceeding.

11.3.3 No arbitrator(s) shall have authority to award any types of damages except those damages permitted under this Agreement. To the fullest extent permitted by applicable Law, any arbitration proceeding and the arbitration award shall be maintained in confidence by the Parties. The Parties agree that the arbitration award shall be final and shall not be subject to judicial review. Judgment on the arbitration award shall be entered and enforced in any court having jurisdiction over the Parties or their assets. It is the intent of the Parties that the arbitration provisions hereof be enforced to the fullest extent permitted by applicable Law, including the Federal Arbitration Act, 9 U.S.C. § 1 et seq.

11.4 <u>Emergency Judicial Relief</u>. Notwithstanding anything to the contrary in this Agreement, the Parties acknowledge and agree that a breach by one Party of any of its obligations under <u>Section 5</u> may cause the non-breaching Party significant and irreparable Losses that cannot be fully or readily remedied in monetary damages in an action at Law. Notwithstanding anything to the contrary in this <u>Section 11</u>, if the other Party has breached (or in the reasonable good faith opinion of the non-breaching Party the other Party is likely to breach) any of its obligations under <u>Section 5</u>, the non-breaching Party shall be entitled to seek an immediate injunction or other equitable relief in addition to any other remedies available under applicable Law or equity, to stop or prevent or reduce Losses arising from such a breach. Each Party waives, to the extent permitted by applicable Law, the requirement that the other Party post bond prior to entry of an injunction.

## 12. FORCE MAJEURE

12.1 <u>Force Majeure</u>. Neither Party shall be liable for any failure or delay in the performance of any of its obligations under this Agreement (except payment obligations) to the extent the delay is attributable to the occurrence of any cause beyond the reasonable control of such Party (each such cause, a "**Force Majeure Event**"). Force Majeure Events may include acts of God,

11

acts of a public enemy, acts of a civil or military authority, pandemic disease recognized by applicable health authorities, trade embargos, terrorist acts, riots, wars, fires, floods, earthquakes or other natural occurrences, labor disputes, strikes, delays in transportation, failures or delays in receiving electronic data, non-performance by suppliers and vendors, or computer software or hardware failures. If a Force Majeure Event delays either Party from timely performing its obligations under this Agreement, the Party shall be excused from completing the delayed obligation until the effects of the Force Majeure Event have sufficiently abated to allow the delayed Party to complete performance.

**13.    MISCELLANEOUS**

13.1    Access to Books and Records. Upon the written request of the Secretary of Health and Human Services or the Comptroller General or any of their duly authorized representatives, Service Provider and any of its Affiliates providing services with a value or cost of $10,000.00 or more over a twelve (12) month period shall make available to the Secretary the contracts, books, documents and records that are necessary to verify the nature and extent of the cost of providing such services. Such inspection shall be available up to four (4) years after the rendering of such services. The Parties agree that any applicable attorney client, accountant client or other legal privilege shall not be deemed waived by virtue of this Agreement.

13.2    Governing Law/Venue. The Parties agree that this Agreement shall be governed by and construed in accordance with the Laws of the State of Tennessee, without giving effect to any choice or conflict of law provision or rule thereof that would cause the application of the laws of any other jurisdiction. The Parties shall comply with the terms of Section 11. Except as otherwise dictated by Section 11, the Parties hereby designate all courts of record sitting in Nashville, Tennessee, both state and federal, as forums where any action, suit or proceeding in respect of or arising out of this Agreement, or the transactions contemplated by this Agreement shall be prosecuted as to all Parties, their successors and assigns, and by the foregoing

designations the Parties hereto consent to the jurisdiction and venue of such courts. Customer acknowledges and agrees that (i) Service Provider's obligations under this Agreement and a Service Agreement shall be the sole responsibility of the Service Provider; (ii) neither HBS nor any of its Affiliates shall have obligations under this Agreement and a Service Agreement, unless they are party to such Service Agreement; and (iii) the rights of Customer under each Service Agreement extend only to the Service Provider that is a party to such Service Agreement.

13.3    Successors and Assigns. Subject to Section 13.4, this Agreement shall inure to the benefit of and be binding upon the Parties hereto and their respective successors and permitted assigns.

13.4    Assignment. Neither Party shall assign this Agreement (whether by operation of law or otherwise) in whole or in part, without the prior written consent of the other Party; provided, however, that (i) Service Provider may, without the prior written consent of Customer, assign its rights and delegate its duties hereunder to one or more of the Service Provider Affiliates; and (ii) Customer may, without the prior written consent of Service Provider, assign its rights and delegate its duties hereunder to one or more of its Affiliates, provided it is understood that Customer shall remain primarily liable for the performance of its obligations hereunder notwithstanding such assignment, and Customer shall require such Affiliate to execute an addendum to this Agreement (in a form acceptable to Service Provider) pursuant to which such Affiliate becomes a Party to this Agreement and assumes the obligations and grants the rights set forth herein to Service Provider. Assignments in violation of this provision shall be null and void. The transfer, in whole or in part, of a Party's rights and/or obligations under this Agreement in the event of a significant organizational transaction shall not constitute an assignment for purposes of this Section 13.4. For purposes of this Section 13.4, a "significant organizational transaction" means (a) a transaction such as, without limitation, a spin-off or sale of assets of a business, provided that the entity to which this Agreement is transferred was, in whole or in part, an Affiliate of the transferring

Party immediately prior to such significant organizational transaction; or (b) an internal reorganization which results in the assigning Party being organized in one or more different legal entities or any other corporate form(s), whether through conversion, merger, or otherwise.

13.5 Subcontract. Notwithstanding anything to the contrary in this Agreement, Service Provider may subcontract any part of the Services to any Person that is not an Excluded Party; provided, however, that Service Provider will not subcontract any obligations involving direct patient interaction to any non-U.S. entity. Obligations which do not involve direct patient interaction may be subcontracted offshore. Service Provider shall remain primarily liable for the performance of any subcontracted Services.

13.6 No Third Party Beneficiaries. No third party shall be considered a third-party beneficiary under this Agreement, nor shall any third party have any rights as a result of this Agreement.

13.7 Rights Cumulative: Waiver. All rights and remedies conferred under this Agreement or by Law shall be cumulative and may be exercised singularly or concurrently. The failure by either Party to enforce any term shall not be deemed a waiver of future enforcement of that or any other term. The provisions of this Agreement are declared to be severable.

13.8 Illegality. In the event any provision of this Agreement is held to be invalid, illegal or unenforceable for any reason and in any respect, such invalidity, illegality, or unenforceability shall in no event affect, prejudice or disturb the validity of the remainder of this Agreement, which shall be and remain in full force and effect, enforceable in accordance with its terms.

13.9 Entire Agreement; Amendment; Order of Precedence. This Agreement constitutes the complete agreement between the Parties relating to the matters specified in this Agreement, and supersedes all prior representations or agreements, whether oral or written, with respect to such matters. No Party shall be entitled to benefits other than those specified herein. No oral modification or waiver of any of the provisions of this Agreement shall be binding on either Party. The Parties specifically acknowledge that in entering into and executing this Agreement, the Parties rely solely upon the representations and agreements contained in this Agreement and no others. This Agreement may only be amended by written agreement of the Parties. In the event one Schedule or Service Agreement is inconsistent with another, the following shall be the order of priority, unless specifically stated otherwise: FIRST, the main body of this Agreement (the Cover Signature Pages, Schedule 1 and Schedule 2 and Schedule 3); and SECOND, the Service Agreements.

13.10 Counterparts. This Agreement, including any amendments and addendums hereto, and/or Service Agreements, may be executed by the Parties individually or in any combination, in one or more counterparts, each of which shall be an original and all of which shall together constitute one and the same agreement.

13.11 Waiver of Jury Trial. THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY AND ALL RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR IN ANY WAY RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.

13.12 Survival. Where the Parties' rights and obligations under this Agreement by their terms or by their nature extend or are contemplated to extend beyond the end of the Term, they will be deemed to survive any termination or expiration of this Agreement for as long as necessary to give full force and effect to such rights and obligations of the Parties.

13.13 Further Assurances. Each Party shall, at the reasonable request and expense of any other Party hereto, execute and deliver to such other Party all such further instruments, assignments, assurances and other documents, and take such actions as such other Party may reasonably request in connection with the carrying out of this Agreement.

13.14 Fair Construction. The language in all parts of this Agreement shall be construed, in all

cases, according to its fair meaning. The Parties acknowledge that each Party and its counsel have reviewed this Agreement and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting Party shall not be employed in the interpretation of this Agreement.

13.15 <u>Independent Contractors</u>. Notwithstanding anything to the contrary in this Agreement, the Parties hereto are independent contractors and that therefore neither Customer nor Service Provider is an employee, partner or joint venturer of the other. Nothing in this Agreement shall be construed as placing the Parties in a relationship of employer-employee, partners or joint venturers.

13.16 <u>Notices</u>.   Any notice, demand or communication required, permitted, or desired to be given hereunder, unless otherwise stated, shall be deemed effectively given when personally received, and shall be sent by (i) express or overnight courier with proof of delivery; or (ii) U.S. Postal Service, certified or registered mail with signed return receipt, addressed to the Parties as set forth on the Cover Signature Pages hereto. Either Party may change the Person and address to which notices or other communications are to be sent to it by giving written notice of any such change in the manner provided herein.

14

## SCHEDULE 2

### Defined Terms

"**Affiliate**" means any Person that directly or indirectly through one or more intermediaries, controls or is controlled by or is under common control with the Person specified.

"**Bad Debt Collection Services**" means collecting delinquent balances that are due from the patient/guarantor and are provided through one of Service Provider's Affiliates, Medicredit, Inc.

"**Business Day**" means every day Monday through Friday in Nashville, Tennessee, U.S., other than those holidays when Service Provider's corporate office in Nashville, Tennessee, is not open for business. Service Provider shall provide a list of Service Provider's holidays to Customer upon request.

"**Claim**" means any allegation, assertion and/or demand asserted or made by or on behalf of a third party and any formal proceeding, investigation, legal action, lawsuit, arbitration, mediation, hearing or proceeding that arises out of such allegation, or that arises out of any action by a Governmental Authority.

"**Confidential Information**" means the terms of this Agreement and all tangible and intangible information and materials being disclosed in connection with this Agreement by one Party ("**Disclosing Party**") to the other Party ("**Receiving Party**"), in any form or medium (and without regard to whether the information is owned by a Party or by a third party), that satisfy at least one of the following criteria: (i) information related to the Disclosing Party's, its Affiliates' or its third party licensors' or vendors' Trade Secrets, customers, pricing, business plans, strategies, forecasts or forecast assumptions, operations, methods of doing business, Records, financial data, assets, tools, technology, SAAS Services, software, systems data or other proprietary or confidential business or technical information; (ii) information designated as confidential in writing by the Disclosing Party or information that the Receiving Party should reasonably know to be information that is of a confidential or proprietary nature; or (iii) any information derived from, or developed by

reference to or use of, any information described in the preceding clauses (i) and (ii). Confidential Information shall not include information that: (a) is in the public domain or is otherwise publicly known; (b) was previously known to the Receiving Party free of any obligation to keep it confidential; (c) was rightfully received by the Receiving Party from a third party whose disclosure would not violate a confidentiality obligation and which disclosure was not in breach of this Agreement; (d) was subsequently and independently developed by Personnel of the Receiving Party without reference to the Confidential Information disclosed under this Agreement; or (e) was approved for release by the written authorization of the Disclosing Party.

"**Customer Data**" means any data and information owned by Customer, including financial data, used in or transmitted by Customer and/or by Service Provider on behalf of Customer in connection with the Services.

"**Customer Law**" means any Law that governs or applies to Customer with regard to its operations, services and/or status as a healthcare provider, or that applies specifically to Customer's receipt of the Services.

"**Early Out Self-Pay Services**" means collection of early stage, non-delinquent balances that are due from the patient/guarantor.

"**Eligibility and Advocacy Services**" means determining if uninsured patients are eligible for Medicaid or other government or charity-based reimbursement program(s).

"**Excluded Party**" means any Person that is excluded, debarred, or otherwise ineligible to participate in any Federal Healthcare Program.

"**Facility**" or "**Facilities**" means any healthcare provider facility(ies) where the Services shall be performed as set forth in each Service Agreement.

"**Federal Healthcare Program**" has the meaning set forth in 42 U.S.C. §1320a-7b(f).

"**Governmental Authority**" means any national, state or local government, any political

15

subdivision thereof or any other governmental, quasi-governmental, judicial, public or statutory instrumentality, authority, body, agency, department, bureau, commission or entity, (including Tricare) that contracts with a governmental entity to administer or assist in the administration of a government program (including any Medicare or Medicaid intermediaries and carriers) or any arbitrator with authority to bind a Party at Law.

"**Indemnified Party**" means the Customer Indemnified Parties or the Service Provider Indemnified Parties against which a Claim subject to indemnification has been asserted.

"**Indemnifying Party**" means, with respect to a Party, the Party itself.

"**Insurance Resolution Services**" means working with insurance payers to secure payments for Service Provider's hospital clients on unpaid or underpaid claims.

"**Law**" means any constitutional provision, statute, ordinance or other law, rule, regulation, interpretation, judgment, decree or order of any Governmental Authority or any settlement agreement or compliance agreement with any Governmental Authority. The Parties acknowledge that in certain instances an applicable Law could constitute both a Customer Law and a Service Provider Law, and all provisions in this Agreement shall be interpreted in a manner consistent with this acknowledgement.

"**Loss**" means any financial loss, damage, injury, penalty, sanction, judgment, fine, liability, cost, expense and fee (including reasonable attorneys'

fees, expert witness fees, investigator fees, court costs, costs and fees associated with arbitration or mediation).

"**Person**" means any natural person, corporation, general partnership, limited partnership, limited liability company, union, association, court, agency, government, tribunal, instrumentality, commission, arbitrator, board, bureau or other entity or authority.

"**Personnel**" means individual Persons that are associated with one of the Parties or its Affiliates, either as employees of the Party or its Affiliates, independent contractors or employees of third parties associated with the Party.

"**Physician Insurance Resolution Services**" means physician billing and collections services for third party financial classes.

"**Records**" means all documents and other materials which contain information relating to the Services.

"**Service Provider Law**" means any Law that governs or applies to Service Provider's provision of the Services and/or that governs or applies to Service Provider as a service provider of services to customers in the healthcare industry.

"**Service Agreement Effective Date**" has the meaning set forth in each Service Agreement.

"**Third Party Liability Services**" means identifying, billing and collecting healthcare claims for three distinct financial classes-workers compensation, general liability claims and motor vehicle accidents.

## SCHEDULE 3

### Business Associate Agreement Terms

**THESE BUSINESS ASSOCIATE AGREEMENT TERMS** ("**Business Associate Agreement**") are part of that Master Services Agreement between Customer ("**Covered Entity**") and Service Provider ("**Business Associate**"), and applies to each Service Agreement entered into by Service Provider on or after the Effective Date of the Master Services Agreement. Except as otherwise set forth in Section 1 below, capitalized terms which are not defined herein shall have the meaning set forth in the Master Services Agreement.

**WHEREAS,** Covered Entity and Business Associate have entered into, or are entering into, or may subsequently enter into, one or more Service Agreements (collectively, the "**Business Arrangements**") pursuant to which Business Associate may provide products and/or services for Covered Entity that require Business Associate to access, create and use health information that is protected by federal law; and

**WHEREAS,** pursuant to the Administrative Simplification provisions of the Health Insurance Portability and Accountability Act of 1996 ("**HIPAA**") and the Health Information Technology for Economic and Clinical Health Act of 2009 ("**HITECH**"), the U.S. Department of Health & Human Services ("**HHS**") promulgated the Standards for Privacy of Individually Identifiable Health Information (the "**Privacy Standards**"), Security Standards for the Protection of Electronic Protected Health Information (the "**Security Standards**") and standards for Breach Notification for Unsecured Protected Health Information (the "**Breach Notification Standards**") at 45 C.F.R. Parts 160, 162 and 164 (collectively, the Privacy Standards, the Security Standards and the Breach Notification Standards are sometimes referred to herein as the "**Confidentiality Requirements**"); and

**WHEREAS,** the Confidentiality Requirements require that certain obligations be extended to Business Associate through an agreement between Covered Entity and Business Associate; and

**WHEREAS,** Business Associate and Covered Entity desire to enter into this Business Associate Agreement in order to satisfy such requirement.

**NOW THEREFORE,** the Parties agree as follows:

1.      **Business Associate Obligations.** Business Associate may use and disclose PHI only as permitted or required by this Business Associate Agreement. All capitalized terms not otherwise defined in this Business Associate Agreement shall have the meanings set forth in the Confidentiality Requirements; provided that Protected Health Information ("**PHI**") and Electronic Protected Health Information ("**EPHI**") are limited to such information created, received, maintained or transmitted by Business Associate from or on behalf of Covered Entity in connection with the Business Arrangements, and all references to PHI herein shall be construed to include EPHI. To the extent Business Associate is to carry out Covered Entity's obligations under the Privacy Standards, Business Associate shall comply with the requirements of the Privacy Standards that apply to Covered Entity in the performance of such obligations.

2.      **Use and Disclosure of PHI.** Business Associate shall use and disclose PHI in compliance with 45 C.F.R. § 164.504(e). Furthermore, Business Associate may use and disclose PHI (i) as required by law, (ii) as necessary to perform its services and obligations under the Business Arrangements, provided that such uses and disclosures would be permissible under the Confidentiality Requirements if the PHI was used or disclosed by Covered Entity in the same manner, and (iii) as necessary for the proper management and administration of the Business Associate or to carry out its legal responsibilities, provided that Business Associate may only disclose PHI for such purposes if such disclosures are required by law or if Business Associate: (a) obtains reasonable assurances from any third party to whom the information is disclosed

17

that it will be held confidentially and further used and disclosed only as required by law or for the purpose for which it was disclosed to the third party; (b) requires the third party to agree to promptly notify Business Associate of any instances of which it is aware that the confidentiality of the information has been breached, as defined in **Section 11**. Business Associate may use and disclose PHI for Data Aggregation purposes, as permitted under the Privacy Standards. Business Associate may use PHI to create de-identified information and use and disclose de-identified information if the de-identification is in compliance with 45 C.F.R. § 164.502(d), and the de-identified information meets the standard and implementation specifications for de-identification under 45 C.F.R. §164.514.

3.      **Minimum Necessary Standard.** Business Associate shall comply with the minimum necessary requirements of the Privacy Standards; provided further, Business Associate shall comply with Section 13405(b) of the HITECH Act, and any regulations or guidance issued by HHS regarding such provision, the minimum necessary standard and the use and disclosure (if applicable) of Limited Data Sets.

4.      **Subcontractors.** In accordance with 45 CFR §164.502(e)(1)(ii) and 45 CFR §164.308(b)(2), Business Associate shall ensure that any of its Subcontractors that create, receive, maintain or transmit PHI and/or EPHI on behalf of Business Associate agree in writing to the same restrictions and conditions that apply to Business Associate with respect to such information and in the case of EPHI, agree to comply with the applicable requirements of the Security Standards.

5.      **Individual Rights Regarding Designated Record Sets.** If Business Associate maintains a Designated Record Set on behalf of Covered Entity, Business Associate shall (i) provide access to, and permit inspection and copying of, PHI by Covered Entity or, as directed by Covered Entity, an individual who is the subject of the PHI under conditions and limitations required under 45 CFR § 164.524, as it may be amended from time to time, and (ii) amend PHI maintained by Business Associate as requested by Covered Entity. Business Associate shall respond to any request from Covered Entity for access by an individual within five (5) days of receipt of such request and shall make any amendment requested by Covered Entity within ten (10) days of receipt of such request. Any information requested under this **Section 5** shall be provided in the form or format requested, if it is readily producible in such form or format. Business Associate may charge a reasonable, cost-based fee for the Business Associate's labor costs in copying the requested PHI, supplies for creating the paper or electronic copy and postage. Business Associate shall notify Covered Entity within five (5) days of receipt of any request for access or amendment by an individual. Covered Entity shall determine whether to grant or deny any access or amendment requested by the individual.

6.      **Accounting of Disclosures.** With respect to disclosures by Business Associate required to be accounted for under 45 CFR § 164.528, Business Associate shall make available to Covered Entity in response to a request from an individual, information required for an accounting of disclosures of PHI with respect to the individual in accordance with 45 CFR § 164.528, as amended by Section 13405(c) of the HITECH Act and any related regulations or guidance issued by HHS in accordance with such provision. Business Associate shall provide to Covered Entity such information necessary to provide an accounting within thirty (30) days of Covered Entity's receipt of request or such shorter time as may be required by state or federal law. Such accounting must be provided without cost to the individual or to Covered Entity if it is the first accounting requested by an individual within any twelve (12) month period. For subsequent accountings within a twelve (12) month period, Business Associate may charge a reasonable, cost-based fee so long as Business Associate informs the Covered Entity in advance of the fee, and the individual is afforded an opportunity to withdraw or modify the request. Such accounting obligations shall survive termination of this Business Associate Agreement and shall continue as long as Business Associate maintains PHI.

7.      **Obligations of Covered Entity.** Covered Entity shall: (i) provide Business Associate with a copy of its notice of privacy practices that Covered Entity produces in accordance with 45 CFR § 164.520 as well as any changes to such notice, to the extent that it affects Business Associate's use or disclosure of

18

PHI; (ii) notify Business Associate of any restriction to the use or disclosure of PHI that Covered Entity has agreed to in accordance with 45 CFR §164.522, to the extent that such restriction may affect Business Associate's use or disclosure of PHI pursuant to the terms of this Business Associate Agreement; (iii) notify Business Associate of any changes in, or revocation of, permission by an individual to use or disclose PHI, to the extent that such changes may affect Business Associate's use or disclosure of PHI; (iv) obtain all consents and authorizations, if any, necessary for any use or disclosure of any PHI as contemplated under the Business Arrangements and (v) only disclose to Business Associate the minimum Protected Health Information necessary to allow Business Associate to perform its obligations under the Business Arrangements.

8.      **Withdrawal of Authorization.** If the use or disclosure of PHI in this Business Associate Agreement is based upon an individual's specific authorization for the use of his or her PHI, and (i) the individual revokes such authorization in writing, (ii) the effective date of such authorization has expired, or (iii) the consent or authorization is found to be defective in any manner that renders it invalid, Covered Entity shall promptly provide Business Associate written notice of such revocation or invalidity, to permit Business Associate to cease the use and disclosure of any such individual's PHI except to the extent it has relied on such use or disclosure, or where an exception under the Confidentiality Requirements expressly applies.

9.      **Records and Audit.** Business Associate shall make available to HHS or its agents, its books and records relating to the use and disclosure of PHI for the purpose of determining Covered Entity's compliance with the Confidentiality Requirements, in a time and manner designated by HHS or its agents.

10.     **Implementation of Security Standards.** Business Associate will use appropriate safeguards to prevent the use or disclosure of PHI other than as expressly permitted under this Business Associate Agreement and will comply with the applicable requirements of the Security Standards.

11.     **Reports.** Business Associate shall report to Covered Entity (a) any use or disclosure of PHI not permitted by this Business Associate Agreement, within seven (7) business days of the Business Associate becoming aware of such use or disclosure; (b) any "breach" (as defined at 45 CFR §164.402) of unsecured PHI ("**HIPAA Breach**") without unreasonable delay and in no event later than seven (7) business days after Business Associate discovers such HIPAA Breach, unless Business Associate is prevented from doing so by 45 C.F.R. § 164.412 concerning law enforcement investigations; and (c) any Security Incident involving EPHI of which it becomes aware; provided, however, that Covered Entity shall be deemed to have received notice from Business Associate through this Agreement of routine occurrences of: (i) unsuccessful attempts to penetrate computer networks or services maintained by Business Associate; and (ii) immaterial incidents such as "pinging" or "denial of services" attacks. The Parties acknowledge and agree that 45 C.F.R. § 164.410 governs the determination of the discovery date of a HIPAA Breach. To the extent known, no later than seven (7) business days following its initial report of a HIPAA Breach, Business Associate shall provide Covered Entity with sufficient information to permit Covered Entity to comply with the HIPAA Breach notification requirements set forth at 45 C.F.R. § 164.400 *et seq*. Between Business Associate and Covered Entity, Covered Entity is responsible for providing any required notices to individuals affected by a HIPAA Breach, unless otherwise agreed to by the Parties.

12.     **Term and Termination.**

12.1    This Business Associate Agreement shall commence on the Effective Date and shall remain in effect until terminated in accordance with the terms the Master Services Agreement.

12.2    Upon the termination of all Business Arrangements, either Party may terminate this Business Associate Agreement by providing written notice to the other Party.

12.3    Upon termination of this Business Associate Agreement for any reason, Business Associate agrees either to return to Covered Entity or to destroy all PHI that is in the possession or control of Business Associate and require its Subcontractors to do the same. In the case of PHI

19

which is not feasible to "return or destroy," Business Associate may retain such PHI, but shall extend the protections of this Business Associate Agreement to such PHI and limit further uses and disclosures of such PHI to those purposes that make the return or destruction infeasible, for so long as Business Associate maintains such PHI. The obligations in this section shall survive termination of this Business Associate Agreement and shall continue as long as Business Associate maintains PHI.

13.   **Miscellaneous.**

13.1   **Notice.** All notices, requests, demands and other communications required or permitted to be given or made under this Business Associate Agreement shall be in accordance with Section 13.16 of Schedule 1 of the Master Services Agreement.

13.2   **Waiver.** No provision of this Business Associate Agreement or any breach thereof shall be deemed waived unless such waiver is in writing and signed by the Party claimed to have waived such provision or breach. No waiver of a breach shall constitute a waiver of or excuse any different or subsequent breach.

13.3   **Severability.** Any provision of this Business Associate Agreement that is determined to be invalid or unenforceable will be ineffective to the extent of such determination without invalidating the remaining provisions of this Business Associate Agreement or affecting the validity or enforceability of such remaining provisions.

13.4   **Entire Agreement.** This Business Associate Agreement constitutes the complete agreement between Business Associate and Covered Entity relating to the matters specified in this Business Associate Agreement, and supersedes all prior representations or agreements, whether oral or written, with respect to such matters. In the event of any conflict between the terms of this Business Associate Agreement and the terms of the Business Arrangements or any such later agreement(s), the terms of this Business Associate Agreement shall control with respect to the subject matter of this Business Associate Agreement unless the Parties specifically otherwise agree in writing. No oral modification or waiver of any of the provisions of this Business Associate Agreement shall be binding on either Party. This Business Associate Agreement is for the benefit of, and shall be binding upon the Parties, their affiliates and respective successors and assigns. No third party shall be considered a third-party beneficiary under this Business Associate Agreement, nor shall any third party have any rights as a result of this Business Associate Agreement.

13.5   **Limitation of Liability.** IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY OR ITS AFFILIATES OR THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES AND AGENTS FOR LOSS OR DAMAGE OF LOST PROFITS OR REVENUES OR SIMILAR ECONOMIC LOSS OR FOR ANY CONSEQUENTIAL, SPECIAL, INCIDENTAL, INDIRECT OR PUNITIVE DAMAGES, WHETHER IN CONTRACT, TORT OR OTHERWISE, ARISING OUT OF OR IN CONNECTION WITH THIS BUSINESS ASSOCIATE AGREEMENT, EVEN IF SUCH PARTY HAS BEEN ADVISED OF SUCH CLAIM. NEITHER PARTY'S AGGREGATE LIABILITY TO THE OTHER AND/OR ANY AFFILIATES OR THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, AND AGENTS FOR ANY CLAIMS ARISING UNDER THIS BUSINESS ASSOCIATE AGREEMENT, REGARDLESS OF THE FORM OF ACTION (INCLUDING, BUT NOT LIMITED TO, ACTIONS FOR BREACH OF CONTRACT, NEGLIGENCE, STRICT LIABILITY, RESCISSION AND BREACH OF WARRANTY), SHALL EXCEED THE TOTAL FEES PAID AND/OR PAYABLE UNDER THE BUSINESS ARRANGEMENTS DURING THE TWELVE (12) MONTHS IMMEDIATELY PRECEDING THE CAUSE OF ACTION.