## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 0:25-cv-62231-AHS

**HEALTH BUSINESS SOLUTIONS, LLC, a Florida limited liability company**
**Plaintiff,**
**v.**

**INSIGHT CHICAGO, INC., a Foreign Profit Corporation,**
**Defendant.**

**Removed From: 17th Judicial Circuit in and for Broward County, Florida, Case No.: CACE-25-014728**

---

### DEFENDANT-COUNTERCLAIMANT INSIGHT'S MEMORANDUM IN OPPOSITION TO PLAINTIFF-COUNTERDEFENDANT, HEALTH BUSINESS SOLUTIONS, LLC'S <u>MOTION TO COMPEL ARBITRATION</u>

### REQUEST FOR HEARING[1]

Under Local Rule 7.1(b)(2), Defendant-Counterclaimant Insight Chicago, Inc. ("Insight") respectfully asks for a hearing or equivalent relief. Under the governing authority, the motion to compel arbitration is akin to a summary judgment supplanting 9 U.S.C. § 4's express right to a jury trial. *See Bazemore v. Jefferson Capital Sys., LLC*, 827 F.3d 1325, 1333 (11th Cir. 2016). Plaintiff's Motion reflects an absence of evidence or authority that a key, putative document (Pl.'s Mot., Ex. 2) is *indeed* a valid contract, that the contract encompassing the arbitration provision (Pl.'s Mot. Ex. 1) facially or actually has *any* application to this case, or that any of these contracts contains an enforceable arbitration agreement. If Plaintiff now comes forth with new authority or evidence, Insight should have an opportunity to refute it before losing the right to trial. An

---

[1] Under LR 7.1(c)(2), the Request for Hearing does not count against the Motion's page limitations.

evidentiary hearing is the most efficient means. Insight respectfully proposes up to 30 minutes for each side to submit documentary evidence and argue its points in chief (or more time if live witness testimony is sought), as well as ten minutes for any legitimate reply or surreply argument.

> *For every complex problem there is an answer that is clear, simple, and wrong.*
> *—H.L. Mencken*

Plaintiff Health Business Solutions, LLC ("HBS") filed an unusual, 6-page motion seeking to compel the arbitration of its own claim. As H.L. Mencken suggests, HBS's motion is clear, simple and *wrong*. In particular, it approaches the wrong forum, seeking the wrong relief under the wrong statutory section, offering a misleading factual statement, invoking the wrong standard of review, and applying the wrong substantive law—all inviting palpable error. Under binding precedent,  Insight, should be permitted to pursue this claim within the same litigation that HBS chose to file.

As for complexity, the relevant facts are more complicated than HBS' Motion suggests. Through this lawsuit, HBS presented a claim about 27 enumerated invoices for medical billing services between June 2023 and August 2025. Those invoices constitute HBS' "claim," which is a series of transactions or common facts, rather than a particular count. *See Viking River Cruises, Inc. v. Moriana ("Viking River")*, 596 U.S. 639, 653-54, 142 S. Ct. 1906, 1919-20 (2022); *Shannon v. Amtrak*, 780 F. App'x 777, 779 (11th Cir. 2019) (citation omitted). <u>**This has *always* been a single dispute over a single set of invoices that reflect the same disputed insurance-pay charges**</u>, and HBS's new admission that it has been citing the wrong contract (for years, in fact) does not change that a whit. After choosing to present this claim in a judicial forum and successfully asserting material judicial rights to discovery and a default, HBS now changes its mind in light of Insight's Counterclaim. As the Counterclaim discusses, even the simplest points of HBS's claim, i.e., its account-stated, is facially wrong considering its actual invoices, (Dkt. No. 013, Cntrclm. ¶¶ 75-79 & Ex. A (attaching invoices); *see also id.* ¶ 72), and the facts only get more

complicated from there.[2] They include years of HBS' choice to proceed under the first-invoked Florida contract, rather than its newly found and newly favored, conflicting Tennessee contract.

The law concerning arbitration is also more complex than HBS suggests. The Supreme Court discusses these nuances in a spate of recent cases from 2022 to 2025, identified herein as *Badgerow*, *Morgan*, *Viking River*, *Spirizzi* and *Suski*. HBS ignores those cases and myriad other authority, instead relying on superseded or unpublished opinions.[3] Seeking to disavow its initial allegations and pleadings, HBS asks for a do-over, and its recent filing of a separate arbitration of the same claim shops for a new forum. The Federal Arbitration Act ("FAA") does not require the Court to reward HBS's duplicitous approach, and it should not do so. For the reasons that follow, HBS' Motion to Compel should be denied.

## I. **BACKGROUND**

This is an evidentiary motion, and the movant, HBS, bears the burden. *See Bazemore*, 827 F.3d at 1333. In Insight's Expedited Motion to Enjoin Arbitration (Dkt. No. 19), Insight set forth the portions of the Court's record that formulate the background for this claim. (*See* Dkt. No. 19 at 3-6.) That record includes (a) the parties' allegations, which articulate the basic factual transaction or "claim" that the lawsuit involves; (b) the timeline of HBS' litigation; and (c) the litigation conduct in which HBS engaged, including a complaint, a successful motion for default and the service of discovery encompassing interrogatories that its newly favored contract prohibits. The Court may take judicial notice of those matters, and Insight expressly incorporates and relies upon them, including their identification of the "State Court Action," the "Florida Agreement" and

---

[2] The Counterclaim includes counts for a four-year pattern of fraud, which is more factually and legally complex. (Dkt. No. 013.) Indeed, the parties previously agreed that this is a "Complex Track" case. (*See* Dkt. No. 018.)

[3] Despite the existence of over 1,000 published cases within the Supreme Court and the Eleventh Circuit about compelling arbitration, HBS asks the Court to rely on these non-authoritative ones.

the "Tennessee Agreement." (*Id.*) This Motion will largely address other evidentiary matters.

  ***HBS's 'Claim.'*** By way of background HBS, filed its Complaint on September 29, 2025, seeking to recover on 27 specifically numbered invoices, stating as fact: (a) the Florida Agreement governed the invoices and its Count 1 for breach of contract; (b) HBS actually and compliantly provided the services due for those invoices (*see* Compl. ¶ 9); (c) the 30-day provisions specific to the Florida Agreement's dispute-resolution process apply to those invoices (*see* Compl. ¶¶ 8, 10); (d) implicitly, HBS followed the Florida Agreement's dispute-resolution process and was thus entitled to collect; (e) HBS properly demanded payment for an account-stated under the Florida Agreement and Florida law (Compl. Count 2); (f) HBS properly terminated the Florida Agreement under its § 6.4 due to non-payment of these specific invoices (Compl. ¶ 11); (g) "Insight did not object to the invoices and/or statements within a reasonable time," (Compl. ¶ 21); and (h) the Florida Agreement renders HBS due the same sums it now seeks to arbitrate under the Tennessee Agreement. (Dkt. No. 1, Compl.) HBS further alleged that the Florida Agreement is "valid and enforceable," although it has not even formally alleged that much for its Tennessee Agreement and the "proposal" for "Full Revenue Cycle Management", (Dkt. No. 16-2 at 1, 2), which it now rebrands as a "Statement of Work," (Dkt. No. 16 at 2) (the "Full Cycle Proposal"). If that proposal is a statement of work under the Tennessee Agreement, then so is the Florida Agreement. But in fact, neither is (*see* below). In any event, these allegations are no longer enough. HBS must provide evidence that the documents are valid and enforceable.

  ***HBS's Benefits From the Florida Agreement.*** Despite that lack of substantiation, HBS has already materially benefitted in this litigation from its reliance upon the Florida Agreement. It successfully invoked the Florida Agreement's particular choice-of-law and venue provisions to obtain hearings and review in a convenient court near its Broward County home and under its

familiar Florida law, both of which are remote to Insight as an Illinois defendant.[4] In addition, HBS served discovery under Florida law, including interrogatories that the Tennessee Agreement specifically prohibits. It also successfully moved for and obtained a clerk's entry of default, which remains pending due to HBS's recent refusal to sign a stipulation to vacate it.[5] So long as that default stands, HBS still maintains the position that the Florida Agreement applies, together with its Florida law and Florida venue.

*The Tennessee Agreement.* HBS now raises three putative agreements, although others not yet mentioned also arose during negotiations but were never signed. According to HBS, the Tennessee Agreement now is the dominant one. But the Tennessee Agreement expressly *only* applies to and includes (or "comprises") "a Service Agreement ***referencing this Agreement*** entered into between the Customer and Service Provider." (Dkt. No. 16-1 & 19-1 at 1 (emphasis added).) *Neither* the Florida Agreement nor HBS's new Full Cycle Proposal references the Tennessee Agreement, (*compare* Dkt. No. 1, Compl. Exh. 1, *with* Dkt. No. 16-2), and thus, by those express terms, neither one is subject to or included within the Tennessee Agreement. Under the FAA, moreover, there is no "clear and unmistakable" language in the Florida Agreement or the new Full Cycle Proposal, through which Insight consents to be bound in either of them by the terms of the Tennessee Agreement.

Yet HBS *needs* some other Service Agreement to fall under the Tennessee Agreement,

---

[4] That choice of a Florida forum and Florida law specifically contradict the Tennessee Agreement's dispute-resolution provisions. Notably, Insight has contested and preserved the issue of whether South Florida is the most appropriate venue, while necessarily conceding that the Florida Agreement makes it *a* possible venue if that contract is enforceable. (*E.g.*, Dkt. No. 13 Ans. at 2 ¶ 4.) By its Notice of Removal and the related statutory procedures, 28 U.S.C. § 1441(a), Insight was *required* to seek protection under the auspices of this Court. *See Hollis v. Fla. State Univ.*, 259 F.3d 1295, 1300 (11th Cir. 2001). Thus, HBS retains its convenient home turf.

[5] Insight pursued a stipulation to vacate that default, (see Dkt. No. 18), and if necessary, it will file a motion to that effect, but the current record stands.

because the Tennessee Agreement does not itself include any payment or invoicing terms—instead deferring to other service agreements for such terms, *see (*Dkt. 16-1, 19-1 § 2.1)—and *none* of the other documents references any arbitration right or clause.

If the Tennessee Agreement had applied, which it facially does not, it presents material problems of its own. It is a 20-page, small-print set of terms and conditions, full of terms that unilaterally benefit HBS and deny its responsibility even for egregious failures. Of immediate importance, it contains terms that directly conflict with the putative service agreements and with its history of actual conduct. In part, its language reflects:

(a) No Payment Schedule: The contract relies upon other contracts' payment schedules.

(b) Right to Claim Breach: "Neither party shall be liable for any delay or failure in the performance . . . under this Agreement or any Service Agreement . . . if and to the extent that such delay or failure is caused by the actions or omissions of the other Party . . . or due to a breach of this Agreement or the Service Agreement by the other Party." (*Id.* § 1.7.)

(c) Invoicing: "The invoice shall identify and itemize each component of the Fees and expenses ***and shall clearly indicate the specific Service Agreement or Service Agreements to which the Fee or expense applies.***" (*Id.* § 2.3.)

(d) Tennessee Courts and the Arbitration *Only* of Properly Handled Disputes: The terms of § 11's informal dispute procedure are *mandatory*, (*id.* § 13.2). Where, as here, a Party does *not* follow that procedure, then—as a default—"the ***Parties designate all courts of record*** sitting in Nashville, Tennessee . . . ***as forums where any action, suit or proceeding*** in respect of or arising out of . . . the transactions contemplated by this Agreement . . . ***shall be prosecuted*** as to all Parties," (*id.*).

Section 11.1 then sets forth a process that HBS did not follow.[6] Under § 11.1, in cases of a disputed Fee, "[t]he Parties shall diligently pursue an expedited resolution of such dispute using the informal dispute resolution procedures set forth in <u>Section 11</u>." (*Id.* § 2.5.) Arbitration otherwise *cannot* be pursued—i.e., it "shall" apply only to "Disputes that cannot be resolved pursuant to . . . <u>Section 11.1</u>," (*id.* § 11.3). Section 11.1 requires the "Engagement Managers" first to try to resolve the dispute. When that fails, the Party can either drop the issue, or pursue it first through a "written notice of Dispute," (*id.* § 11.1).

---

[6] HBS does not make any evidentiary attempt to show that it followed the process. Yet without such a showing the Agreement facially does not *permit* or reflect any agreement to arbitrate. That failure matters *more* here than in the usual single-contract case or common condition-precedent, because *HBS*'s pleadings rely on conflicting agreements, and the relevant substantive ones do *not* permit any form of arbitration. Where, as here, HBS simply proceeded under a different and conflicting dispute-resolution procedure, it acted inconsistently with any right to arbitrate.

With that notice, the matter "escalate[s] to an officer" of each Party, (*id.*) who must meet in person within 5 business days.

The Tennessee Agreement then provides two different provisions about filing arbitration. In § 11.1, it says that if the 35-business-day process above does not work (i.e., roughly 7 weeks), either Party can initiate arbitration under § 11.3. In § 11.2, it differently says that if the process in § 11.1 "does not lead to a mutually acceptable resolution . . . within sixty (60) days (or any longer period of time mutually agreed to by the Parties)," then a Party can initiate arbitration under § 11.3.

(e) <u>Restricted Discovery and Venue Selection:</u> For disputes over $300,000 (*but not* smaller, presumable less consequential ones), "Discovery ***will not include depositions or interrogatories*** except as the arbitrators expressly allow on a showing of need." (*Id.* § 11.3.2.) HBS putatively violated that restriction by serving interrogatories. In addition, for such larger disputes, "[t]he arbitration proceedings shall be held in Nashville, Tennessee"—a location that bears no relation to either Party whatsoever, except that HBS chose it. (*Id.* § 11.3.2.) Both restrictions are *precisely backwards*, in that they unreasonably limit the more consequential disputes.

(f) <u>Restricted Schedule:</u> Only the larger disputes—not the smaller ones—contain an express limitation of 90 days for trial and 120 days for a decision. *That restriction is also precisely backwards.*

(g) <u>Choice of Law</u>: As HBS notes, the Tennessee Agreement purports to choose Tennessee law, *id.* § 13.2.

(h) <u>Indemnification for Legal Non-Compliance:</u> "Service Provider shall indemnify and hold harmless Customer . . . to the extent such Losses [i.e., attorney fees, costs and expenses, § 7.1] are caused by (i) the fraud [or] gross negligence of [Service Provider], or (ii) any failure by [Service Provider] to comply with the Law," (*id.* § 7.2).

(i) <u>Disclaimer of Warranties and Denial of Damages</u>: The contract imposes unilateral limitations benefitting HBS. (*See* §§ 8.2 & § 9 as well as § 11.3.3.) Insight facially did *not* accept such limitations in the Florida Agreement and facially did *not* defer to the Tennessee Agreement in Full Cycle Proposal. It further proffers that it *would not* accept them. Pointing to HBS's lack of proof for summary judgment purposes, Insight proffers that Insight never knowingly conceded to waive substantive rights concerning HBS's frauds or for its "material violation of Service Provider Laws," see § 10.1.

(j) <u>Waiver</u>: The main Tennessee contract—in express distinction to its subservient Business Associate Agreement (*id.* at 20)—does not require a waiver to be in writing, but rather denies oral waivers and says that waivers by conduct do not prohibit new future enforcement in new situations. (*Id.* § 13.7, 13.9.)

***The Florida Agreement.*** The Florida Agreement is much simpler, ends after a shorter term, and has served as the basis for all HBS's negotiations. It does not reference the Tennessee Agreement and instead conflicts with it.

(a) <u>Payment Schedule</u>: The Florida Agreement provides a 30-day payment schedule. (Dkt. No. 1, Compl. Exh. 1, § 3.2.)

(b) <u>Right to Claim Breach</u>: The Florida Agreement allows HBS to seek recover for putative breaches without regard to its own delays or failures in performance—that is, it does not contain any similar limitation. (*See* Compl. Exh. 1 in its entirety.)

(c) <u>Invoicing</u>: The Florida Agreement does not require HBS to specify the governing contract (which it did not do), but instead says, "If [Insight] has any valid reason for disputing any portion of the invoice, [it] will so notify HBS within seven (7) calendar days of receipt of invoice, and if no such notification is given, the invoice shall be deemed to be valid," (*id.* § 3.2). The contract does not state who will deem the dispute valid. (*Id.*)

(d) <u>Informal Dispute Resolution and Formal Suit in the Florida Courts</u>: The Florida Agreement does not permit arbitration. It provides for the informal dispute-resolution process in its § 3.2 and formal resolution by the state and federal courts, § 9.7.

(e) <u>Restricted Discovery and Venue Selection</u>: The Florida Agreement does not restrict discovery. Thus, it allowed HBS to serve interrogatories and other discovery in this case.

Importantly, and without any express regard or limitation to this particular contract, the Florida Agreement directly contradicts the Tennessee Agreement on venue: "***The parties consent to the exclusive jurisdiction of*** the State courts located in Broward County, Florida or ***the United States District Court Southern District of Florida. All claims, actions and proceedings shall otherwise be brought in Broward County, Florida.***" (*Id.* § 9.7.)

(f) <u>Restricted Schedule</u>: The Florida Agreement does not restrict the schedule for discovery, trial or decision.

(g) <u>Choice of Law</u>: As HBS notes in its Complaint here, HBS provided that the Agreement "shall be governed by and construed in accordance with the laws of the State of Florida," (*id.*)—in direct contradiction with the Tennessee Agreement.

(h) <u>Indemnification for Legal Non-Compliance</u>: As to HBS's non-compliance, the Florida Agreement specifically, properly and at length requires HBS to comply with applicable laws, including CMS billing regulations. (*Id.* § 4.2.) As to indemnification, see the more lenient and bilateral "hold harmless" provisions of § 7.2.

(i) <u>Disclaimer of Warranties and Denial of Damages</u>: Contrary to HBS's disclaimers in Tennessee, compare the express compliance provision in § 4.2, above. (*Id.* § 4.2.)

(j) <u>Waiver</u>: The Florida Agreement does not address the issue of waiver. It allows for signed, written modifications and amendments, § 9.6.

***The New Proposal.*** For the first time in its Motion, HBS presents as a putative "Statement of Work" a document that facially presents itself as a "proposal [that] outlines the scope of work to a Revenue Cycle transitional outsource model (the 'Project')." (Dkt. No. 16-2 at 2.) This document bears no resemblance to the formality and legalism of the Tennessee or Florida

7

Agreements. Instead, throughout six pages of small, colloquial, ambiguous text—often in the form of proposal-style bullet points—HBS's drafted document speaks in conversational and aspirational language, discussing things like a "close partnership with the Insight's Chicago team," (*id.* at 3), "HBS['s] commit[ment] to protecting the privacy and security" of information, (*id.* at 2), and similar phrases. It does not materially define or commit to discrete services on discrete, accountable terms. Instead, it is full of the ambiguous puffery common to business and sales pitches rather than contracts. HBS does not provide any factual evidence that HBS *itself* understood the new Proposal to actually operate like a contract which bound HBS to something in particular. Contrary to the Tennessee Agreement, its invoices never cited the Proposal.

Taken literally, there is nothing on the document's face to give Insight notice that it would be a *contract* (much less, one governed by the Tennessee Agreement), rather than a *proposal* to be explored—that is, in the nature of a contract-to-contract or an agreement-to-agree. Indeed, the document itself anticipates defining and agreeing to material terms *later*; for example:

- "Design, planning and implementation of workflows, processes, technical tools or communication methodologies will be completed in partnership with current Insight Chicago colleagues," (*id.* at 4);

- "Metric and goal-setting will be an iterative process to be agreed upon at the start of the project, then periodically thereafter," (*id.* at 6); and

- It has blank spaces that await filling for its "Interim Leadership and Staff" (*id.*).

As a testament to the document's aspirational nature, HBS fails to provide any evidence that it fulfilled entire categories of the services it proposed, and its own exhibits include separate formal contracts for some of the contemplated items. The document proposes: "The scope of the Project will include management and staffing for the following functions: ***registration,*** billing, collections, cash posting, credits management, ***and self-pay***." (*Id.* at 2.) Insight denies that HBS provided

patient-registration service or acted as it if were ever bound to do so, and HBS elsewhere codified a formal self-pay contract (i.e., *in the Florida Agreement*).[7]

The Full Cycle Proposal is, in fact, an unenforceable agreement-to-agree. *See, e.g.*, *Cape, LLC v. Och-Ziff Real Est. Acquisitions LP*, 370 So. 3d 1010, 1015 (Fla. 5th DCA 2023) ("The trial court correctly concluded that the Summary of Terms, without more, was an unenforceable agreement to agree."); *Triton Stone Holdings, L.L.C. v. Magna Bus., L.L.C.*, 308 So. 3d 1002, 1005 (Fla. DCA 2020) (lack of agreement on all material terms); *Four Eights, LLC v. Salem*, 194 S.W.3d 484, 486 (Tenn. Ct. App. 2005) (agreements to agree "have generally been held unenforceable, both in this jurisdiction and others."). More specifically, Insight points to HBS' lack of evidence of any meeting of the minds about the nature of the document, and further denies that it actually viewed or agreed to this "proposal" *as* a contract. Instead, Insight proffers that it signed off on this document expressly *as* a *proposal* to explore—that is, an agreement-to-consider-agreeing in good faith and to give HBS' approach a "try." If the document is not a contract, it is not a Service Agreement, and it is irrelevant to the Tennessee Agreement even beyond its failure to reference that contract.

---

[7] If this document were a contract, it would differ markedly from the Tennessee and Florida Agreements—which is partly why Insight did not view it as a contract:

(a) Payment Schedule: None; (b) Right to Claim Breach: No discussion at all of disputes or breaches—or what it might even *mean* to breach this document; (c) Invoicing: No discussion of any billing schedule, invoicing requirements or invoicing practices, except that "HBS will earn contingent fees on recoveries as defined below," (*id.* at 6); (d) Dispute Resolution and Formal Suit: Nothing; (e) Restricted Discovery and Venue Selection: None; (f) Restricted Schedule: None; (g) Choice of Law: None; (h) Indemnification for Legal Non-Compliance: None; (i) Disclaimer of Warranties and Denial of Damages: None; and (j) Waiver: None.

## II. **ARGUMENT**

A. **THE FAA'S STATUTORY TEXT PROHIBITS THE RELIEF HBS SEEKS UNDER § 4, PROHIBITS HBS FROM OBTAINING A STAY UNDER § 3 AS A MOVANT-IN-DEFAULT, AND PROVIDES A JURY TRIAL FOR DISPUTED QUESTIONS.**

To compel arbitration of its previously filed claim, HBS invokes *Section 3* of the FAA, (Dkt. No. 16 at 1). Section 3, however, concerns stays of litigation, while *Section 4*, 9 U.S.C. § 4, governs motions to compel. Neither grants the relief HBS seeks. Section 4 states, in pertinent part:

> A party aggrieved by the ***alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration*** may petition any United States district ***court which, save for such agreement, would have jurisdiction*** under Title 28 [28 USCS §§ 1 et seq.], in a civil action . . . ***of the subject matter*** of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement. . . . The court shall hear the parties, and ***upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue***, the court shall make an order directing the parties to proceed to arbitration ***in accordance with the terms of the agreement. The hearing and proceedings, under such agreement, shall be within the district in which the petition for an order directing such arbitration is filed. If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof***. . . . Where such an issue is raised, the party alleged to be in default may . . . demand a jury trial of such issue, and ***upon such demand the court shall make an order referring the issue or issues to a jury*** in the manner provided by the Federal Rules of Civil Procedure, or may specially call a jury for that purpose.

*Id.* (emphasis added).

Before turning to the standard of review, three simple aspects of the FAA's statutory text merit reflection. *First*, HBS *cannot*—under the terms of Section 4—ask this District Court to compel arbitration in Tennessee. Instead, if this Court wanted to compel arbitration, the arbitration "hearing and proceedings" would have to be in this District. *See Lindberg v. Universal Life Ins. Co.*, No. 8:24-cv-2602-CEH-SPF, 2025 U.S. Dist. LEXIS 228251, at *11 (M.D. Fla. Nov. 20, 2025) (collecting cases adopting this majority position, as well as cases within the Eleventh Circuit applying this majority position). But such an order would directly conflict with HBS' putative Tennessee Agreement, which *requires* a Tennessee arbitration. (Dkt. No. 16-1 § 11.3.2.) On the

other hand, if HBS now files a new case and petition in the Middle District of Tennessee, it would only magnify a claim-splitting approach—twice invoking the jurisdiction and resources of two different federal courts to address the same claim. That would invite an injunction under the All Writs Act, 28 U.S.C. § 1651. (*See* Dkt. No. 19.) Supposing that the Tennessee Agreement applies at all, HBS cannot both invoke *and* deny the terms of its new arbitration provision, especially after having voluntarily chosen to ignore that provision before and during this lawsuit.

*Second*, before proceeding to arbitration, Section 4 expressly grants a jury trial on material, disputed matters here. *See Bazemore*, 827 F.3d at 1333. Insight denies that it culpably failed to perform any arbitration agreement to which it could be bound or which could be enforced. Insight contends that the Tennessee Agreement facially does not apply, and there was never any meeting of the minds to apply it to these invoices, i.e., this *claim*. Instead, Insight honored and proceeded under the contractual dispute-resolution provisions that *HBS itself* invoked, albeit ones that conflict with HBS's new demands. If the Tennessee Agreement applies at all, then it applies at least as much to the Florida Agreement as to the Full Cycle Proposal. But in that case, HBS made its choice between conflicting provisions, and Insight relied on HBS's choice. HBS cannot now disavow the first contract and then invoke § 4 by blaming Insight for relying on HBS's first contract. And HBS cannot itself repeatedly violate the new provision for months or years and then invoke § 4 by blaming Insight for failing to honor that provision. Meanwhile, Insight denies that the Full Cycle Proposal is, in fact, a contract, and without it, HBS has nothing to arbitrate. Finally, Insight denies that it ever agreed to arbitrate any fraud or misrepresentation claim.[8] If Insight's arguments hold

---

[8] Therefore, "the first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626, 105 S. Ct. 3346 (1985); *Orellana v. Roblox Corp.*, 769 F. Supp. 3d 1273, 1280 (M.D. Fla. 2025).

water, the statutory text entitles Insight to a trial on such matters, and it demands a jury.[9] *See* [D.E. 23].

*Third*, and relatedly, HBS *cannot* invoke Section 3 to seek a stay of this Court's proceedings because it has repeatedly defaulted on the arbitration provision's obligations. Section 3 states that a district court can "stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, ***providing the applicant for the stay is not in default*** in proceeding with such arbitration." 9 U.S.C. § 3 (emphasis added). "To determine whether a party has defaulted for Section 3 purposes, a court must 'decide if, under the totality of the circumstances, the party *has acted inconsistently* with the arbitration right.'" *Bedgood v. Wyndham Vacation Resorts, Inc.*, 88 F.4th 1355, 1369 (11th Cir. 2023) (emphasis added) (quoting *Ivax Corp. v. B. Braun of Am., Inc.*, 286 F.3d 1309, 1315-16 (11th Cir. 2002)). This federal test for a default under the FAA is similar to, but slightly different than, the tests that address the issue of a *waiver* of the contractual right, which should invoke state law. *See* p. 16-17, *infra*.

To be fair, under the standards of this federal test, mere delays are not necessarily inconsistent with an assertion of the arbitration right, unless they are very long. *See Welborn Clinic v. Medquist, Inc.*, 301 F.3d 634, 637 (7th Cir. 2002). Other actions are also not *necessarily* inconsistent, such as writing a letter posturing about the potentially negative consequences of arbitration, depending on the context. *See JPD, Inc. v. Chronimed Holdings, Inc.*, 539 F.3d 388, 393 (6th Cir. 2008), *overruled on other grounds by Morgan*, 596 U.S. 411. And just as in *Bedgood*, a party that opposes arbitration can lose its right to litigate by failing to provide evidence that the compelling party acted inconsistently with arbitration. But evidence of pre-litigation conduct that

---

[9] As set forth below, that is also why HBS' motion is like a summary judgment motion to test the cause for a trial. *Larsen v. Citibank FSB*, 871 F.3d 1295, 1308 (11th Cir. 2017); *see World Rentals & Sales, LLC v. Volvo Constr. Equip. Rents, Inc.*, 517 F.3d 1240, 1248 (11th Cir. 2008).

is actually *inconsistent* with arbitration should and does matter to the analysis. *See, e.g.*, *GPM Se. LLC v. Riiser Fuels LLC*, 647 F. Supp. 3d 674, 698 (E.D. Wis. 2022). In contrast with *Bedgood*, and in case HBS newly advances evidence to support its motion, Insight proffers for hearing:

- HBS engaged in many pre-litigation months or years of pre-litigation negotiations based upon the Florida Agreement;

- HBS neglected over that lengthy period to rely upon the Tennessee Agreement and instead repeatedly invoked the *inconsistent* provisions of the Florida Agreement;

- HBS neglected (and still neglects) to comply with the Tennessee Agreement's prior pre-arbitration, dispute-resolution process;

- HBS sent a pre-litigation letter threatening a lawsuit (not a costly and inconvenient arbitration) based on the Florida Agreement (Pl.'s Compl. Exh. 1 in Dkt. No. 1);

- HBS neglected to promptly file for arbitration rather than commence this lawsuit;

- HBS chose to articulate its claim (i.e., the nucleus of facts) in relation to the Florida Agreement, rather than either of the newly cited, conflicting agreements (Pl.'s Compl. & Exhs.);

- HBS filed the State Court Action to assert its claim (Pl.'s Compl.);

- HBS took actions in direct defiance of the arbitration agreement, such as serving interrogatories that are specifically *barred* by the Tennessee Agreement's arbitration provisions (*see* Dkt. No. 1);

- HBS invoked state litigation procedures to serve other discovery only available in judicial proceedings, and it issued initial disclosures in the State Court Action, pursuant to Fla. R. Civ. P. 1.280 (*id.*);

- HBS successfully filed a motion for a default in the State Court Action (*id.*), and it continues to refuse to vacate that default; and

- HBS participated in discovery conferences here, until it came across its arbitration theory having gotten cold feet about federal court (*see* Dkt. Nos. 17 & 18).

The factual basis of the argument stems almost entirely from the Court's own record, of which this Court can take judicial notice.

Finally, in such matters of default or "waiver," the Supreme Court recently clarified that the non-movant need *not* show prejudice to prevail, *Morgan*, 596 U.S. at 418, thereby overruling

a great deal of Eleventh Circuit precedent expressly including *S&H Contractors, Inc. v. A.J. Taft Coal Co.*, 906 F.2d 1507, 1514 (11th Cir. 1990); *see also Gaudreau v. My Pillow, Inc.*, 2022 WL 3098950, at *6 (M.D. Fla. Jul. 1, 2022).   In light of *Morgan*, the movant need only act inconsistent—and prejudice simply amplifies the non-movant, Insight's, position. By acting inconsistently with the putative Tennessee (arbitration) Agreement, HBS is in default of its arbitration obligations. Its default is magnified by the prejudice Insight suffered by exposing it to Florida law and the Florida courts, obtaining a judicial default against it, serving arbitration-prohibited discovery, and (if granted) eliminating Insight's rights to interrogatories and depositions. Having defaulted, HBS cannot now proceed under Section 3.

### B.  <u>STANDARD OF REVIEW</u>

HBS presents its motion to compel as one under Rule 12(b)(1) for lack of subject matter jurisdiction, but nothing about the FAA impacts the Court's jurisdiction. The FAA does not grant federal jurisdiction. *Badgerow v. Walters*, 596 U.S. 1, 4 (2022) (quoting *Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 581-82 (2008) (the FAA "bestow[s] no federal jurisdiction but rather require[es] an independent jurisdictional basis"; in turn citing *Moses H. Cone Memorial Hospital v. Mercury Constr. Corp.*, 460 U.S. 1, 25, n. 32, 103 S. Ct. 927 (1983)). Nor do Sections 3 or 4 divest federal jurisdiction. *See Smith v. Spizzirri*, 601 U.S. 472, 478 (2024) (court retains jurisdiction amid Section 3 stay).[10] Moreover, even where—unlike here—a matter is arbitrable, the remedy is to compel arbitration and *stay* the matter, not to dismiss it. A dismissal would mandate reversal. *Spizzirri*, 601 U.S. at 475-76, 144 S. Ct. at 1176-77 (court lacks discretion to

---

[10] Instead, when applicable, they rely upon the Court's possession of independent federal jurisdiction, 9 U.S.C. §§ 3, 4; *see Badgerow*, 596 U.S. 1. Even in the context of international arbitration related to the FAA, only a legitimate foreign (i.e., international) forum *selection* clause, rather than a foreign arbitration clause, might disrupt jurisdiction, *see Lindo v. NCL (Bahamas) Ltd.*, 652 F.3d 1257, 1267, 1280 (11th Cir. 2011).

dismiss).

A request to compel is correctly analyzed more like a summary judgment motion, *In re Checking Account Overdraft Litig.*, 754 F.3d 1290, 1294 (11th Cir. 2014); *see also Larsen*, 871 F.3d at 1308; *World Rentals & Sales, LLC*, 517 F.3d at 1248, which must evaluate what contracts might exist or apply and whether any of them is enforceable. If arbitration-related provisions in two potentially governing contracts conflict, and those contracts further conflict as to who should decide the issue (e.g., arbitrability), then that issue is for the courts, not a private arbitrator, to decide. *See also Coinbase, Inc. v. Suski*, 602 U.S. 143, 145, 144 S. Ct. 1186, __ (2024). As a corollary, "before [the conflicting provisions such as a] forum selection clause can be enforced, a court needs to decide what the parties have agreed to—i.e., which contract controls." *Id.*

In all this, familiar summary judgment-style standards apply. *See Bazemore*, 827 F.3d at 1333. The facts are taken in the light most favorable to the non-movant, Insight, just as with the construction of any other contractual provision or argument over whether a contract, in fact, existed. *See Williams v. Shapiro*, 724 F. Supp. 3d 1295, 1299 n.2 (N.D. Ga. 2024); *see generally Morgan*, 596 U.S. at 417-18 (arbitration agreements are only par with other contracts, and federal courts "cannot . . .  create arbitration-specific variants of federal procedural rules").[11] At least for its legal determinations, an order compelling arbitration receives *de novo* review, *In re Checking Account Overdraft Litig.*, 754 F.3d at 1294 (citations omitted), although its factual findings

---

[11] For a recent lengthy, useful and instructive application of a summary judgment-style analysis, see *McDonald v. Grimsly*, 772 F. Supp. 3d 1306, (M.D. Ala. 2025). Note, however—despite any other *dicta* in *McDonald*—that 'mere' allegations in the pleadings also can matter to the motion, as discussed above. Sometimes, as under § 4, the parties' allegations themselves *are* the 'evidence' of what is substantively at issue in the claim. *Compare Williams*, 724 F. Supp. 3d at 1299 n.2 (non-movant need not controvert allegations that movant did not factually support). In terms of "looking through" to the pleadings to understand the substance of the case and find an *independent* jurisdictional basis, the motion to compel under § 4 resembles aspects of a dismissal motion.

probably track ordinary summary judgment review.

C. **THE COURT SHOULD DENY PLAINTIFF HBS'S MOTION TO STAY OR COMPEL ARBITRATION OF ITS PREVIOUSLY FILED CLAIM, BECAUSE HBS HAS NOT MET ITS BURDEN TO PROVE THAT AN ARBITRATION AGREEMENT SHOULD CONTROL THE CLAIM.**

When considering the existence, revocability and enforceability of a putative written agreement to arbitrate, HBS admits that state law applies. (Dkt. No. 16 at 3.) Although the *Morgan* Court declined in 2022 to revisit whether a federal rather than state test applies to enforcement issues such as "waiver or forfeiture or what-have-you," 596 U.S. at 417, 419,[12] recent cases reinforce the Court's settled rule and rationale—especially pertinent in diversity cases—that state law generally governs the construction and enforceability of contractual rights under an arbitration agreement. These are substantive questions of contract law, which properly receive state-law answers under the *Erie* Doctrine. In 2009, the Supreme Court said:

> Neither [Section 2 nor 3] purports to alter background principles of state contract law regarding the scope of agreements (including the question of who is bound by them). Indeed § 2 explicitly retains an external body of law governing revocation (such grounds "as exist at law or in equity"). *And we think § 3 adds no substantive restriction to § 2's enforceability mandate.* "[S]tate law," therefore, is applicable to determine which contracts are binding under § 2 *and enforceable under § 3* "if that law arose to govern issues concerning the validity, revocability, and *enforceability of contracts generally.*" *Perry v. Thomas*, 482 U.S. 483, 493, n. 9, 107 S. Ct. 2520, 96 L. Ed. 2d 426 (1987). *See also First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944, 115 S. Ct. 1920, 131 L. Ed. 2d 985 (1995).

*Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630-31 (2009) (notes omitted) (emphases added).[13] Consistent with this binding precedent, the Southern District recently remarked, "for

---

[12] *Compare Morgan v. Sundance, Inc.*, 596 U.S. 411, 413, 416-17, 142 S. Ct. 1708 (2022) (noting the appellate courts' earlier, traditional phrasing as 'waiver'; and expressly assuming without deciding that a federal test could apply to waiver).

[13] More recently, the *Badgerow* Court invoked state law and state jurisdiction to determine who would review an arbitration award, 596 U.S. at 18, 142 S. Ct. at 1321-22 ("[This] application concerns the contractual rights provided in the arbitration agreement, generally governed by state

purposes of determining whether [movant] may *enforce* the Arbitration Clause, the Court must apply Florida law." *Calcaterra v. Baptist Health S. Fla., Inc.*, 733 F. Supp. 3d 1349, 1354 (S.D. Fla. 2024) (emphasis added). *See generally Osterer v. Bam Trading Servs. Inc.*, 753 F. Supp. 3d 1289, 1295 (S.D. Fla. 2024) (applying Florida law by way of Eleventh Circuit decisions that, in turn, relied on state law, to discuss who is bound by estoppel to an agreement).

     ***Choice of Law.*** As for which state's law applies—Florida, Tennessee, Illinois or someplace else—"[a] federal court sitting in diversity will apply the conflict-of-laws rules of the forum state." *Grupo Televisa, S.A. v. Telemundo Communs. Grp., Inc.*, 485 F.3d 1233, 1240 (11th Cir. 2007) (citing *Klaxon Co. v. Stentor Elec. Mfg.*, 313 U.S. 487, 496, 61 S. Ct. 1020 (1941)). "The first step in considering the arbitrability of any contract containing an arbitration clause is for the Court to resolve any formation challenge to the contract containing the arbitration clause," which it resolves under the law of the forum state. *Whisenhunt v. Ameracat, Inc.*, 731 F. Supp. 3d 1279, 1288 (S.D. Ala. 2024) (also citing *Klaxon*). In the process, the court does *not* apply the choice-of-law clause of the very agreement whose existence or enforceability is challenged. *See Fridman v. 1-800 Contacts, Inc.*, 554 F. Supp. 3d 1252, 1259 (S.D. Fla. 2021) ("Applying the choice-of-law clause to resolve the contract formation issue would presume the applicability of a provision before its adoption by the parties has been established."). Moreover, HBS' conduct makes the result simpler than it otherwise might be if the parties had each respectively committed to different states' laws. Since HBS relied upon Florida law to pursue this claim and obtain meaningful and convenient relief through it, HBS is judicially estopped and cannot now disavow Florida law on the same claim. These is *no* sense in which Tennessee law should apply to this motion.

---

law."; holding state court has jurisdiction concerning enforcement of arbitration award where application under Section 9 or 10 does not facially support federal jurisdiction).

***Authority for Waiver, Estoppel and Claim Splitting.*** In its Expedited Motion, Insight set cited a series of authoritative cases on federal waiver-by-conduct, (Dkt. No. 19 at 9-13), Florida equitable estoppel (*id.* at 15-16), Florida and federal judicial estoppel (*id.* at 16-17), and federal claim-splitting, *id.* at 17-19). Insight hereby relies on those cases and adds the following points.

***HBS Waived Any Right to Arbitration.*** Authority in the area of arbitration is undergoing change and more refined articulation. Some federal cases traditionally talk about "waiver," which might be better analyzed as a federal-style "default" under the FAA. *See generally* note 12, *supra*. In the multitude arbitration-related cases, some might apply a federal "actions inconsistent" test, when state waiver law should govern. Fortunately, this motion can side-step that unclarity for two reasons. *First*, HBS agrees that state-law applies. *Second*, for all the reasons set forth in Insight's Dkt. No. 19 at 9-13, HBS has acted inconsistently with its arbitration rights here and failed the federal test any way. To that, Insight adds three evidentiary matters here: (1) the absence of any evidence by HBS to rebut HBS' waiver-by-conduct ; (2) the actual facts concerning the content of putative contracts (above), the Proposal's status as a proposal not a contract, the inconsistencies among the documents, and their inapplicability to allow arbitration here; as well as (3) a proffer of *years* of conduct inconsistent with the Tennessee Agreement, *see* p. 13-14, *supra*. It might be that HBS acted inconsistently with the Tennessee Agreement for so long because—despite having drafted and demanded it—it simply forgot about the document throughout the parties' history.

Since Florida authority controls, moreover, it provides an even clearer, more conclusive answer. It was up to HBS to investigate and decide how it wanted to proceed on its invoices under these putative contracts, because "[a] party to an arbitration agreement and that party's counsel are charged with knowledge of the arbitration agreement." *Est. of Williams ex rel. Williams v. Manor Care of Dunedin, Inc.*, 923 So. 2d 615, 617 (Fla. 2d DCA 2006). The Tennessee Agreement—

even if facially inapposite—bore the same relation to these invoices throughout the parties' relationship, and it was up to HBS to invoke it here. Its Complaint did not do that. In Florida, a party (even a *defendant*) who submits its claim to litigation in an initial pleading waives arbitration. *See Soloman Law Group, P.A. v. Dovenmuehle Mortgage, Inc.*, 332 So. 3d 56, 59 (Fla. 2d DCA 2021) (plaintiff's complaint); *King's Acad., Inc. v. Caliendo*, 418 So. 3d 643 (Fla. 4th DCA 2025) (defendant's answer). The same principle applies even more justly to a party such as HBS, who foregoes its arbitration-related agreement entirely, in favor of another contract.

In addition, "Florida's appellate courts have consistently found waiver where a party [serves or] participates in discovery on the merits before moving to compel arbitration." *Lion Gables Realty Ltd. v. Randall Mech., Inc.*, 65 So. 3d 1098, 1100 (Fla. 5th DCA 2011) (citing *Gordon v. Shield*, 41 So. 3d 931, 933 (Fla. 4th DCA 2010) (propounding discovery waives right)); *Green Tree Servicing, LLC v. McLeod*, 15 So. 3d 682, 688 (Fla. 2d DCA 2009) ("[P]ropounding discovery related to the merits of pending litigation before moving to compel arbitration results in a waiver of the right to arbitration."). Here, HBS as an unhurried *plaintiff* facing no statute of limitations—rather than a responding party—filed its complaint and served merits discovery in the State Court Action, including interrogatories prohibited by the Tennessee Agreement. It also based *all* its other discovery on the Florida Agreement (Dkt. No. 1). Then, it successfully moved for a clerk's entry of default.  Under Florida law, HBS unequivocally waived arbitration.

***Estoppel-Based Holdings.*** Estoppel comes in many forms, and space does not permit a long discussion. Here, HBS obtained a default based on the Florida Agreement, expressly asserting that it governs *these* invoices. In Florida, judicial estoppel bars a party "who assumes a particular position or theory in a case . . . [from,] in a later phase of that same case . . . asserting any other or inconsistent position toward the same parties and subject matter.'" *Dora v. Morrison*, 384 So. 3d

19

290, 294 (Fla. 5th DCA 2024). When analyzing the issues of waiver-by-conduct, HBS *cannot* now disavow the Florida Agreement or its applicability. Thus, the only question is whether its prior 100% reliance on the Florida Agreement waives its new, conflicting reliance on the Tennessee Agreement. It does. Here, as in *Dora*, HBS otherwise "would gain an unfair advantage." *Id.* at 294-95. HBS's conduct is the kind of "playing fast and loose with the courts" that judicial estoppel is designed to prevent, and *id.*, this is precisely type of unfair change in position that *equitable* estoppel also seeks to stop in Florida.

In addition, Florida courts recognize the prohibition against claim splitting between judicial and arbitral proceedings. "As a general rule the law mandatorily requires that ***all damages sustained or accruing to one as a result of a single wrongful <u>act</u>*** must be claimed and recovered in one action or not at all." *Land v. GMC*, 906 So. 2d 1154, 1156 (Fla. 4th DCA 2005) (arbitration and judicial), *quoted in Watkins v. Azael*, 2022 Fla. Cir. LEXIS 5979, *2 (Fla. 1st Cir. Ct. Jan. 12, 2022). To prevent gamesmanship, it is the basic nucleus of invoices—not the newly invoked contract—that matters. In light of space constraints, if the Court believes it would benefit from additional briefing on Florida law, Insight requests the directive an opportunity to provide it.

## <u>CONCLUSION</u>

For each of these reasons, HBS's motion to compel arbitration should be denied.

Dated: December 31, 2025

              */s/* George S. LeMieux, Esq

              **GUNSTER, YOAKLEY & STEWART, P.A.**
              450 East Las Olas Boulevard, Suite 1400
              Fort Lauderdale, FL 33301
              Telephone: 954-468-1383

              George S. LeMieux, Esq.
              Florida Bar No. 16403
              glemieux@gunster.com

eservice@gunster.com
mzayas@gunster.com
Lauren A. Marcil
Florida Bar No.: 1002832
lshumate@gunster.com

CLANCY ADVISORS, PLC
Saura J. Sahu (pro hac vice)
2723 S. State Street, Suite 150
Ann Arbor MI 48104
Telephone: 734-780-7595
sahu@clancyadvisors.com
www.clancyadvisors.com

*Attorneys for Defendant, Insight Chicago, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on December 31, 2025, the foregoing was electronically filed with the Clerk

of the Court by using the CM/ECF system, which will send a notice of electronic filing to all

counsel of record.

/s/ George S. LeMieux, Esq
George S. LeMieux, Esq